[Cite as *In re J.B.*, 2021-Ohio-807.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: J.H., | : | No. 19AP-517 |
| | | (C.P.C. No. 17JU-1949) |
| (S.M., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| | | |
| In re: J.G., | : | No. 19AP-518 |
| | | (C.P.C. No. 17JU-1951) |
| (S.M., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on March 16, 2021

**On brief:** *Steven Thomas D. Potts*, for appellee Franklin County Children Services. **Argued:** *Steven Thomas D. Potts.*

**On brief:** *Yeura Venters*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce.*

APPEALS from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

KLATT, J.

{¶ 1} Appellant, S.M. ("mother"), appeals judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted permanent custody of J.H. and J.G. to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm those judgments.

{¶ 2} Mother has two children, J.H. and J.G. In February 2016, FCCS received a report that J.H. had not attended school for two years. FCCS verified that report, and a

caseworker began working with mother to enroll J.H. in an on-line school. Mother did not timely complete the application process but blamed her failure on the caseworker and Columbus City schools.

{¶ 3} In addition to neglecting J.H.'s education, mother also did not attend to J.H.'s medical needs. J.H. weighed 366 pounds and had been diagnosed with morbid obesity. Although J.H.'s primary care physician had referred J.H. to the Center for Healthy Weight and Nutrition at Nationwide Children's Hospital in 2015, mother had not followed up on that referral.

{¶ 4} Mother also did not maintain a safe home for her children. FCCS caseworkers observed massive amounts of clutter in the home. Mother had stacked items from floor to ceiling in every single room to the extent that the furniture was not visible or functional. The FCCS caseworker also observed piles of dirty clothes and stacks of dirty dishes.

{¶ 5} Finally, and most importantly, mother reported to the FCCS caseworker events and conversations that did not occur. For example:

> On June 14, 2016, Mother was informed of the [temporary order of protective supervision] filing for [J.G., which FCCS would make three days later on June 17, 2016]. At that time, Mother said she filed an appeal for the [temporary order of protective supervision] filing the week prior. * * * Mother also reported she was being evicted from her home. Mother reported that she contacted the rental assistance department at FCCS (department doesn't exist) and was informed the caseworker had not yet made a referral. She then reported that the referral was not received until June 15, 2016 (a future date). Mother also said she had spoken to the caseworker's supervisor[,] which was not true * * *. On June 15, 2016, Mother was observed to be pleasant and not displaying the erratic behaviors she did the day before. Mother reported that she was not being evicted until she is "served the eviction on the 1st."

(FCCS Ex. 1.)

{¶ 6} On June 13, 2016, FCCS filed a complaint alleging J.H. was a dependent child. Four days later, FCCS filed a complaint alleging J.G. was a dependent child. After a preliminary hearing, a magistrate granted FCCS a temporary order of protective

supervision for the children.  The magistrate also ordered mother to obtain a mental health assessment and a psychological evaluation, and to follow all recommendations.

{¶ 7}   On August 1, 2016, a magistrate granted FCCS temporary orders of custody over J.H. and J.G.  As the trial court pointed out in its decision, the record only contains a copy of the August 1, 2016 order pertaining to J.H.  However, the FCCS caseworker testified that FCCS obtained temporary orders of custody as to both children on August 1, 2016.  Moreover, as the trial court recognized, all parties concede that J.G., like his brother, has been in FCCS' physical custody since August 1, 2016.

{¶ 8}   Mother did not cope well with the loss of custody.  She repeatedly accused J.H.'s and J.G.'s foster parents of abusing and neglecting the children.  FCCS arranged for nurses to examine the children twice a week, and no findings of abuse or neglect ever resulted.

{¶ 9}   In October 2016, psychologists from Forum Ohio conducted a psychological evaluation of mother.  As a result of this evaluation, mother was diagnosed with delusional disorder, persecutory type, and mental health counseling was recommended.  Mother began counseling at Access Ohio.

{¶ 10} From June 2016 through February 2017, FCCS filed complaints regarding J.H. and J.G. a series of three times.  The trial court dismissed the first two rounds of complaints because dispositional hearings did not occur within 90 days of the filing of the complaints as required by R.C. 2151.35(B)(1).  FCCS filed the complaints in the instant actions on February 14, 2017.  The complaints alleged that J.H. was a dependent and negligent child, and J.G. a dependent child.  A magistrate immediately granted FCCS a temporary order of custody over the children.

{¶ 11} A combined adjudicatory and dispositional hearing occurred on March 30, 2017.  In judgments issued April 4, 2017, the trial court amended the complaints to read:

> Mother allegedly has mental health issues including anxiety and delusional disorder—persecutory type.  According to the psychological evaluation from Forum [Ohio], mother displays symptoms that others are exploiting or harming her or her children and she has unjustified doubts of the trustworthiness of FCCS.  She has reportedly demonstrated aggressive behavior towards caseworkers, foster parents, and court personnel without evidence of an attack on her or her children, indicating a potential for a personality disorder.

> On multiple occasions in July of 2016, Franklin County Children Services and the Guardian ad Litem (GAL) observed the home to have narrow pathways, clothes/toys/boxes stored against the walls and in open places, clutter throughout the house and blocking entry to the kitchen, piles of dirty clothes, a foul odor, trash and dishes overflowing in the kitchen.
>
> Since the case opened, mother has filed multiple contempt motions and complaints against FCCS and the GALs and foster parents. Mother also alleges that FCCS and foster parents are responsible for neglect of her children.
>
> [J.H.] has been diagnosed as morbidly obese and autistic. He weighed 366 lbs. in Feb. 2016 and since going into foster care, he has lost a significant amount of weight and as of Feb. 2017 he now weighs 272 lbs. [J.H.] needs special care for his autism diagnosis. [J.H.] did not attend school from 2014 until going into foster care in Aug. 2016.

(Apr. 4, 2017 Jgmts. at Mag.'s Decisions at 2.)

{¶ 12} In addition to amending the complaints, the trial court adjudicated J.H. and J.G. dependent children and committed them to the temporary custody of FCCS pursuant to R.C. 2151.353(A)(2). The trial court also approved and adopted the case plan developed by FCCS and made that plan an order of the court. Finally, the trial court ordered mother to only provide food for J.H. at the visitation that was recommended by his physician.

{¶ 13} On August 28, 2017, the trial court granted the first extension of temporary custody to FCCS. On April 10, 2018, the trial court granted the second extension.

{¶ 14} FCCS moved for permanent custody of J.H. and J.G. on June 26, 2018. As of that date, both children had been in FCCS' custody for over 12 months of a consecutive 22-month period. In its motions for permanent custody, FCCS alleged that mother had failed to consistently engage in treatment for her mental illness and had not demonstrated the ability to maintain long-term mental stability. FCCS stated that mother continuously displayed aggressive behaviors, both physical and verbal, toward FCCS staff and team members throughout the pendency of the case.

{¶ 15} The trial court held a hearing on FCCS' motions for permanent custody on May 8, 9, and 10, 2019. Mother and the children's maternal grandmother testified. Additionally, the FCCS caseworker assigned to the family and the guardian ad litem for the

children also testified.  The caseworker and guardian ad litem both recommended that the trial court grant FCCS permanent custody of the children.

{¶ 16} On August 1, 2019, the trial court entered judgments granting FCCS permanent custody of J.H. and J.G.  The trial court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1), the children had been in FCCS' custody for 12 months out of a consecutive 22-month period and awarding FCCS permanent custody was in the children's best interests.

{¶ 17} Mother now appeals the August 1, 2019 judgments, and she assigns the following errors:

> [1.] The lower court's judgment awarding permanent custody of the children to Franklin County Children Services was against the manifest weight of the evidence.
>
> [2.] The trial court abused its discretion when it failed to conduct an in-camera interview of J.G. and J.H.
>
> [3.] The lower court erred when, without holding a hearing where it interviewed J.G., it denied him his right to counsel in the PCC trial where the GAL had a conflict of interest which resulted in a failure to advocate the minor child's interests as to custody.

{¶ 18} To facilitate the analysis of mother's assignments of error, we will begin our review with mother's third assignment of error.  By that assignment of error, mother argues that the trial court erred in not appointing independent counsel for J.G.  Throughout the proceedings, J.G. was represented by the guardian ad litem, who served in a dual capacity as both J.G.'s guardian ad litem and attorney.

{¶ 19} "Pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, syllabus.  A guardian ad litem may serve a dual role as both the guardian ad litem and the juvenile's attorney, and thereby fulfill the juvenile's right to counsel.  *Id.* at ¶ 18.  However, "when a guardian ad litem who is also appointed as the juvenile's attorney recommends a disposition that conflicts with the juvenile's wishes, the juvenile court must appoint independent counsel to represent the child."  *Id.*; *accord In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099,

¶ 37, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 44 (" '[S]hould the wishes of the children, as expressed either directly by them or through the guardian ad litem, evidence a strong desire to be reunited with [a parent], and should the guardian ad litem's position regarding the best interest of the children conflict with those wishes, the trial court should appoint separate counsel to represent the children.' ").

{¶ 20} Because the right to counsel is a personal right, we must consider whether mother has standing to raise on J.G.'s behalf the issue of whether the trial court erred in failing to appoint J.G. independent counsel. "Parents have standing to appeal an error committed against their children only if the error is prejudicial to the parents' rights." *In re S.S.*, 10th Dist. No. 12AP-322, 2012-Ohio-4794, ¶ 26; *accord In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, ¶ 15 (10th Dist.); *In re B.L.*, 10th Dist. No. 04AP-1108, 2005-Ohio-1151, ¶ 44. Consequently, a parent has standing to appeal an error committed against a child when the parent and child share interests in that they both seek reunification. *In re B.L.* at ¶ 44. Any error prejudicial to the child's interest in reunification is similarly prejudicial to the parent's interest, giving the parent standing to assert the error on appeal. *In re S.B.* at ¶ 16.

{¶ 21} Here, at the time of the permanent custody hearing, J.G. was approximately three-and-one-half years old. He had been diagnosed with a speech delay and was undergoing speech therapy. Due to J.G.'s age and limited communication abilities, the guardian ad litem could not determine his wishes regarding placement. However, J.G.'s foster mother reported to the guardian ad litem that J.G. had said to her at various times, "see mommy [J.H.]" or "I want more mommy [J.H.]." (May 8, 2019 Tr. at 30.)

{¶ 22} We do not interpret J.G.'s words as a desire for reunification with his mother. At best, J.G. expressed a wish to see more of his mother and brother. That, however, does not amount to a choice to live with mother. Because mother lacks evidence that J.G.'s interests were aligned with hers, mother does not have standing to raise the deprivation of counsel issue for J.G.

{¶ 23} Nevertheless, assuming that standing existed, we find no error in the trial court's refusal to appoint J.G. independent counsel. As we stated above, a trial court should appoint independent counsel when the child has expressed a "strong desire" that differs with the guardian ad litem's recommendation. *In re L.W.*, 2018-Ohio-2099, at ¶ 37. A trial

court need not consider the appointment of independent counsel based on a child's occasional wish to be with a parent. *In re C.R.*, 5th Dist. No. 2020CA00044, 2020-Ohio-4082, ¶ 21; *In re B.J.L.*, 4th Dist. No. 18CA14, 2019-Ohio-555, ¶ 48. Here, by stating "see mommy [J.H.]" or "I want more mommy [J.H.]," J.G. may have indicated he wished to spend time with his mother and brother, but he did not communicate a strong desire to reside full-time with his mother. Accordingly, we overrule mother's third assignment of error.

{¶ 24} Mother's first and second assignments of error challenge the trial court's decision to grant FCCS permanent custody of J.H. and J.G. under R.C. 2151.414. A juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency * * * and that any of the following apply:"

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 25} Once the juvenile court decides that one of the circumstances in R.C. 2151.414(B)(1) applies, the court turns to R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest. Pursuant to R.C. 2151.414(D)(1), in determining a

child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month-period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 26} Here, the trial court found that the children met the criteria of R.C. 2151.414(B)(1)(d), as they had been in FCCS' temporary custody for 12 months of a consecutive 22-month period. After consideration of the R.C. 2151.414(D)(1) factors, the trial court concluded that granting FCCS permanent custody of J.H. and J.G. was in the children's best interests.

{¶ 27} By her second assignment of error, mother argues that the trial court abused its discretion in not conducting an in-camera interview of J.H. and J.G. to determine their wishes. We disagree.

{¶ 28} As we set forth above, one of the best-interest factors is "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). This section "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 55. Consequently, an appellate court will not reverse a trial court's decision to accept the

testimony of the guardian ad litem over that of the child absent an abuse of discretion. *Id.* at ¶ 56.[1]

{¶ 29} Here, at a pre-trial conference conducted November 28, 2018, mother's attorney requested that the trial court conduct an in-camera interview of both children. However, before the permanent custody hearing began on May 8, 2019, the trial court erroneously stated, "[n]obody asked for an in-camera interview." (Tr. at 29.) At that point, mother's attorney did not object or remind the court that, in fact, the mother had asked for such an interview. Consequently, mother arguably waived her request that the trial court interview J.H. and J.G.

{¶ 30} Even if mother did not waive her request, we are not persuaded the trial court abused its discretion in not conducting an in-camera interview. Mother argues that the trial court should have personally interviewed the children because the record contained evidence that they were capable of expressing their wishes regarding placement. For J.G., mother points to his statements "see mommy [J.H.]" and "I want more mommy [J.H.]," and asserts that these statements show that J.G. can articulate his wishes. For the reasons we set forth above, these statements do not contradict the guardian ad litem's testimony that J.G.'s age and speech limitations prevented him from understanding adoption and communicating his wishes regarding placement.

{¶ 31} For J.H., mother asserts that the trial court's appointment of independent counsel for J.H. means that J.H. must have voiced a desire in conflict with the guardian ad litem's recommendation. Mother reasons that because the guardian ad litem advocated for the grant of permanent custody to FCCS, J.H. must have stated a wish to live with her. However, mother misunderstands the reason the guardian ad litem requested independent counsel for J.H. The guardian ad litem explained to the trial court that due to J.H.'s autism, J.H. had limited communications skills, and his confusing answers to the guardian ad litem's questions left the guardian uncertain as to J.H.'s wishes. Consequently, in an

---

[1] We cannot, as mother urges us, apply R.C. 3109.04 to determine whether the trial court erred in not interviewing the children in chambers. If we did so, mother's request would have rendered an in-camera interview mandatory, not discretionary. This outcome would contravene *In re C.F.*, which held that a trial court may refuse a parent's request for an in-camera interview of a child in a permanent custody proceeding. *Id.* at ¶ 55. "As an intermediate appellate court, we are bound to follow precedent set by the Supreme Court of Ohio and we cannot issue a decision in conflict with a decision of the Supreme Court that has not been reversed or overruled." *State v. Tatom*, 10th Dist. No. 17AP-758, 2018-Ohio-5143, ¶ 24.

abundance of caution, the guardian ad litem requested an independent counsel for J.H. "just in case we * * * get into trial and all of a sudden * * * there was" a conflict of interest between J.H. and the guardian ad litem. (Nov. 28, 2018 Tr. at 7.) Thus, the appointment of an independent counsel for J.H. did not constitute evidence that J.H. expressed a wish to live with mother.

{¶ 32} At the permanent custody hearing, the guardian ad litem testified that he believed J.H.'s autism precluded him from understanding the effect the permanent custody proceedings could have on him. J.H.'s autism also restricted his ability to communicate. Although J.H. told the guardian ad litem he liked living with his foster parents and he was doing well in school, he could not answer the guardian's questions about where he wanted to live in the future. The guardian ad litem thought he "would have gotten there by now" with J.H., and elicited J.H.'s desire as to placement, but J.H. was never able to clearly express his wishes. (May 9, 2019 Tr. at 154.)

{¶ 33} Mother contends that the trial court should have personally interviewed J.H., despite the guardian ad litem's testimony, in light of the statement J.H.'s attorney made in his written closing argument that J.H.'s "wishes are that he remains in the custody of his mother." (Closing Argument of J.H. at 1.) However, J.H.'s attorney did not submit his closing argument until August 5, 2019—four days *after* the trial court issued its judgment granting FCCS permanent custody of J.H. The trial court, therefore, could not consider any statement in that argument when determining whether to conduct an in-camera interview of J.H. or whether to grant FCCS permanent custody.

{¶ 34} In the end, we conclude that the trial court did not abuse its discretion by not conducting an in-camera interview of the children. Accordingly, we overrule the second assignment of error.

{¶ 35} By the first assignment of error, mother argues that the trial court's award of permanent custody of J.H. and J.G. to FCCS was against the manifest weight of the evidence. We disagree.

{¶ 36} An appellate court will not reverse a juvenile court's determination in a permanent custody case unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered at trial, to support one

side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).  Thus, in reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered.  *Id.* at ¶ 20.

{¶ 37}  Additionally, in conducting a manifest weight review, an appellate court must make every reasonable presumption in favor of the trial court's judgment and findings of fact.  *Id.* at ¶ 21.  If the evidence is susceptible to more than one construction, an appellate court must interpret it in the manner most consistent with the judgment.  *Id.*  Moreover, " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' "  *In re H.H.*, 10th Dist. No. 19AP-158, 2019-Ohio-4953, ¶ 49, quoting *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34.

{¶ 38}  In the case at bar, mother did not contest that J.H. and J.G. had been in FCCS' custody for 12 or more months of a consecutive 22-month period when FCCS moved for permanent custody.  Accordingly, because the condition set forth in R.C. 2151.414(B)(1)(d) was established, the trial court was statutorily authorized to grant FCCS permanent custody of the children if clear and convincing evidence existed that it was in the children's best interest to do so.  *See In re A.M.*, ___ Ohio St.3d ___, 2020-Ohio-5102, ¶ 18 (holding that, before granting a motion for permanent custody, a juvenile court must find by clear and convincing evidence that (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies, and (2) a grant of permanent custody is in the child's best interest).

{¶ 39}  Under the first best-interest factor, the trial court must consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child."  R.C. 2151.414(D)(1)(a).  In its decision, the trial court recognized that

mother "faithfully" attended two-hour visitations with her children on Tuesdays and Thursdays. (Aug. 1, 2019 Jgmts. at 19.) Moreover, in its discussion of the first best-interest factor, the trial court stated that both J.H. and J.G. were "excited to see and are bonded with Mother." *Id.* at 20.

{¶ 40} Mother argues that the trial court failed to give her bond with the children the substantial weight it deserved. However, "[i]n a best-interests analysis under R.C. 2151.414(D), a court must consider 'all relevant factors,' including [the] five enumerated statutory factors * * *. No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 57, quoting R.C. 2151.414(D)(1). Here, there is no indication that the trial court did not consider the totality of the circumstances, equally weighing each of the relevant factors, to come to its judgment. In other words, the trial court properly afforded mother's bond with the children the same weight as the other relevant considerations in its best-interest determination. The trial court, therefore, did not err as mother asserts.

{¶ 41} Under the second best-interest factor, the trial court must consider "the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Mother asserts that the trial court erred because it failed to specifically address in its decision the children's wishes or whether they were incapable of expressing their wishes.

{¶ 42} Initially, we note that R.C. 2151.414(D)(1) contains no requirement that the trial court include in its decision an express discussion of or findings regarding the best-interest factors. *In re A.M.*, 2020-Ohio-5102, at ¶ 31. Here, however, the trial court followed best practices: it set forth the evidence it relied on when considering the R.C. 2151.414(D)(1)(b) best-interest factor; namely, the guardian ad litem's testimony reflecting that neither J.H. nor J.G. were capable of expressing their wishes. When the evidence demonstrates that a child is not capable or competent to communicate his or her wishes, a trial court is not required to assess the wishes of that child in determining whether permanent custody is in the child's best interest. *In re C.M.*, 10th Dist. No. 07AP-933, 2008-Ohio-2977, ¶ 63. Thus, because J.H. and J.G. could not express their wishes, the trial court did have to factor those wishes into its best-interest analysis.

{¶ 43} In arguing to the contrary, mother contends that the record includes evidence of J.G.'s wishes, as testified to by the guardian ad litem. Mother asserts that J.G.'s statements that "see mommy [J.H.]" and "I want more mommy [J.H.]" are evidence of J.G.'s wishes that the trial court should have considered. We are not persuaded. In considering the R.C. 2151.414(D)(1)(b) factor, the court must take into account the child's wishes *regarding placement. In re D.S.*, 10th Dist. No. 07AP-479, 2007-Ohio-6781, ¶ 37. As we stated above, while J.G. expressed an occasional desire to see his mother and brother, he did not state he wanted to live full-time with his mother. J.G., therefore, never articulated any wishes regarding placement.

{¶ 44} Under the third best-interest factor, the trial court must consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(D)(1)(c). Mother criticizes the trial court for merely repeating its earlier finding that J.H. and J.G. had been in FCCS' custody for over 12 months of a consecutive 22-month period. She contends that the trial court must expand its review to include consideration of her efforts to complete the case plan. We are not persuaded.

{¶ 45} "While the trial court may consider additional facts beyond the 12-out-of-22 circumstance in its analysis under R.C. 2151.414(D)(1)(c), the court is under no obligation to do so." *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 30. Here, the trial court's review of the children's custodial history included the observation that the court had twice extended FCCS' temporary custody of the children to give mother more time to remediate the conditions that resulted in the children's removal. The trial court also noted that FCCS had to remove J.G. from his first foster home because the foster mother could not handle mother's unsubstantiated abuse and neglect complaints. Therefore, although not under any requirement to expand its review, the trial court went beyond a simple 12-out-of-22 analysis.

{¶ 46} Moreover, we expressly reject mother's insistence that a review of her children's custodial history requires the trial court to consider the amount of progress she ultimately achieved in completing the case plan. In considering the R.C. 2151.414(D)(1)(c) best-interest factor, the court must focus on establishing a custodial timeline for the child.

Mother has not shown how evidence that she completed some case plan goals by the date of the permanent custody hearing has any bearing on her children's custodial history.

{¶ 47} Under the fourth best-interest factor, the trial court must consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). Mother argues that by complying with the case plan she proved that the children can achieve a legally secure permanent placement with her. The trial court, however, found that mother has not demonstrated her ability to assume custody of her children.

{¶ 48} Mother has been diagnosed with multiple mental illnesses, including delusional disorder, persecutory type; depression; and anxiety. Most recently, she was diagnosed with posttraumatic stress disorder and other specified personality disorder with paranoid and obsessive-compulsive personality features. The psychological evaluation in October 2016 resulted in the recommendation that mother receive mental health counseling. In late 2016, mother began receiving services, including psychiatric treatment and mental health counseling, from Access Ohio. Mother also began taking prescription medications to treat her mental illness.

{¶ 49} Mother and the FCCS caseworker give conflicting evidence as to the dates mother underwent mental health counseling. To resolve this conflict, the trial court relied on the Access Ohio record of appointments that mother introduced, which showed that mother attended her last counseling appointment at Access Ohio on October 10, 2017. Mother, therefore, sporadically attended mental health counseling from December 15, 2016 to October 10, 2017. (Mother's Ex. A.)

{¶ 50} At the time of trial, mother was neither undergoing counseling nor taking all the prescribed medications. Mother claimed that she could not attend counseling or purchase her medications because her health insurance had lapsed. To assist mother in returning to treatment, the FCCS caseworker gave mother a list of mental health treatment providers that offer services on a sliding fee schedule. Mother never completed the intake process to obtain mental health treatment through any of these providers.

{¶ 51} The trial court found that mother needs consistent, long-term mental health counseling. We conclude that the manifest weight of the evidence supports this conclusion.

Moreover, the manifest weight of the evidence demonstrates that mother is currently not receiving the mental health treatment she needs.

{¶ 52} Throughout the pendency of this case, mother has displayed repeated disruptive and abusive behavior. The FCCS caseworker could not review the entirety of the case plan with mother because mother became irate and began yelling and verbally abusing the caseworker. As the FCCS caseworker stated at the hearing, "there's really no kind of redirecting her and trying to keep her on track of what the original discussion was without her continuing to get escalated and so to prevent that I just will end the conversation." (May 8, 2019 Tr. 146.) The FCCS caseworker also testified that mother has screamed at and verbally abused the FCCS receptionist, and mother has yelled during telephone conferences with the FCCS caseworker and her supervisor. When the mother sees the FCCS caseworker at mother's visits with J.H. and J.G., mother screams at the caseworker to the extent that other people in the office come over to check on the caseworker's wellbeing. A supervisor sat with the FCCS caseworker throughout one visit to ensure that mother behaved herself. On one occasion, mother threw papers at the caseworker and told her to pick them up.

{¶ 53} Mother has also been verbally abusive towards her own mother during the visits with J.H. and J.G., calling her mother stupid and lazy in front of the children. In her own testimony, the maternal grandmother acknowledged that mother called her names and disparaged her, including at visits when J.H. and J.G. could hear her.

{¶ 54} When the guardian ad litem visited mother's home to conduct a home study, mother threatened to have him arrested if he did not leave in ten minutes. The guardian ad litem testified that mother's "behavior is so disordered that, unless she gets help, I don't think that she can parent her kids." (May 9, 2019 Tr. at 159.) According to the guardian ad litem, mother's aggressive and hostile behavior has continued unabated since the case began.

{¶ 55} Based on this evidence, the trial court concluded that, if the children were returned to mother's custody, mother would treat everyone involved in the children's lives in the same manner she displayed in this case, and mother would do so in front of the children. Consequently, the court reasoned, "[i]f returned to Mother's custody, Mother's entrenched pattern of lashing out at others will have a serious negative and detrimental

impact on [J.H.] and [J.G.]."  (Aug. 1, 2019 Jgmts. at 19.)  We find the trial court's conclusions are supported by the manifest weight of the evidence.

{¶ 56}  Finally, mother has no appreciation of J.H.'s weight and food issues. Although J.H. weighed 366 pounds in February 2016, mother testified at trial that J.H. had no weight concerns at that point.  J.H.'s primary physician had referred J.H. to the Center for Healthy Weight and Nutrition at Nationwide Children's Hospital ("Center"), but mother did not schedule an appointment for J.H. at the Center.  After J.H. entered foster care, he began treatment at the Center, and he lost a significant amount of weight.  Mother, however, undermined his progress.  Although advised of J.H.'s appointments at the Center, mother did not attend them.  Moreover, at visits with J.H., mother would bring chips, cookies, candy, soda pop, and other fattening food.  Although the FCCS caseworker advised mother about healthy food choices for J.H., mother continued to provide J.H. with junk food at the biweekly visits.  J.H. would gorge himself at the visits and vomit when he returned to his foster home.  Given mother's testimony and actions, the trial court concluded that mother "still accepts no responsibility for her autistic son's [m]orbid [o]besity, and * * * [w]ere [J.H.] to be returned to her custody, [m]other would resume his neglect."  (Aug. 1, 2019 Jgmts. at 11.)  The manifest weight of the evidence supports this conclusion.

{¶ 57} We recognize that mother completed some of the goals in the case plan.  At the time of the permanent custody hearing, she had obtained housing and employment. However, " 'while evidence of case plan compliance is relevant to a best-interest determination, it is not dispositive of it.' " *In re M.W.*, 2020-Ohio-5199, at ¶ 57, quoting *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 55.  Moreover, a finding that a parent has satisfied case plan goals does not necessarily equate to a finding that the parent has the ability to assume custody of a child.  *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 31.  That is the problem here.  While mother has complied with some aspects of the case plan, mother has not demonstrated behavioral stability or effective parenting skills.  Thus, the manifest weight of the evidence demonstrates that mother is still uncapable of giving her children a legally secure permanent placement.

{¶ 58} Under the fifth best-interest factor, the trial court must consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents

and child."  R.C. 2151.414(D)(1)(e).  The trial court found no R.C. 2151.414(E)(7) through (11) factors applied.  The parties concur.

{¶ 59}  In addition to the foregoing facts, the trial court also considered the guardian ad litem's recommendation that the trial court grant FCCS permanent custody. Additionally, the trial court considered that both children have special needs: J.H. is autistic and receives services from the Franklin County Board of Developmental Disabilities, both children have an individualized education plan, and J.G. attends speech therapy.  Finally, the trial court considered that J.H.'s foster parents were willing to adopt J.H. and were contemplating adopting J.G., too, if given the opportunity.

{¶ 60}  After weighing all relevant factors, the trial court concluded that a grant of permanent custody to FCCS was in the children's best interest.  We find that the manifest weight of the evidence supports that conclusion.

{¶ 61}  Next, mother argues that the trial court's decision that FCCS made reasonable efforts under R.C. 2151.419 is against the manifest weight of the evidence.  R.C. 2151.419, however, does not apply to this permanent custody determination.

{¶ 62}  Pursuant to R.C. 2151.419(A)(1):

> Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.  The agency shall have the burden of proving that it has made those reasonable efforts.

{¶ 63}  By its terms, R.C. 2151.419(A)(1) applies only to "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state."  *In re C.F.*, 2007-Ohio-1104, at ¶ 41.  Therefore, the statute does not apply to motions for permanent custody filed pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.  *Id.* at ¶ 41, 43.

{¶ 64} However, in *In re C.F.*, the Supreme Court of Ohio held that, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43. Reasonable efforts, therefore, will only become an issue at the permanent custody hearing if the issue has not arisen before the hearing. Consequently, a trial court is only obligated to determine that the agency used reasonable efforts to reunify a family based on evidence from the permanent custody hearing if the agency has not established that it made reasonable efforts prior to that hearing. *In re G.B.*, 9th Dist. No. 19CA011599, 2020-Ohio-3220, ¶ 41; *In re J.J.*, 5th Dist. No. 2019CA00167, 2020-Ohio-1020, ¶ 42; *In re N.R.S.*, 3d Dist. No. 3-17-07, 2018-Ohio-125, ¶ 25.

{¶ 65} Here, the trial court's April 4, 2017 judgments, which adjudicated the children as dependent and granted FCCS temporary custody of them, stated that "reasonable efforts have been made to prevent or eliminate the need for removal of said child[ren] from the child[ren]'s own home." (Apr. 4, 2017 Jgmts. at Mag.'s Decisions at 1.) Mother neither objected to these judgments nor appealed them. These judgments satisfied R.C. 2151.419(A)(1), thus relieving the trial court from the obligation to make a reasonable-efforts finding in the permanent custody judgment.

{¶ 66} We cannot reverse a judgment based on an alleged error in a finding that the trial court never had to make in the first place. Nonetheless, in our review of the record, we conclude that the trial court did not err in finding FCCS made reasonable efforts to reunite J.H. and J.G. with mother. The evidence demonstrates that the FCCS caseworker provided mother with resources in an attempt to help mother complete her case plan goals. FCCS gave the mother free bus passes to help mother with transportation, monthly calendars with the children's appointments written in, assistance with finding housing, and a list of mental health providers that provided services on a sliding fee basis. That mother wanted even more from FCCS does not negate the assistance she received. Therefore, even though the finding was not required, the trial court did not err in finding that FCCS made reasonable efforts to eliminate the continued removal of the children from the home and to make it possible for the children to return safely home.

{¶ 67} In sum, the manifest weight of the evidence supports the grant of permanent custody to FCCS. Accordingly, we overrule the first assignment of error.

{¶ 68} For the foregoing reasons, we overrule the first, second, and third assignments of error, and we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

BEATTY BLUNT and BROGAN, JJ., concur.

BROGAN, J., retired, of the Second Appellate District, assigned to active duty under authority of Ohio Constitution, Article IV, Section 6(C).