[Cite as *In re N.M.*, 2021-Ohio-2080.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| N.M. et al., | : | No. 20AP-158 and 20AP-169 |
| [E.M. and W.M., | : | (C.P.C. No. 17JU-10324) |
| Appellants]. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on June 22, 2021

**On brief:** *William T. Cramer*, for appellant E.M.

**On brief:** *Yeura Venters*, Public Defender, and *Robert D. Essex*, for appellant W.M.

**On brief:** *Serena M. Coppula*, for appellee Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BROWN, J.

{¶ 1} Appellants, W.M. ("Mother") and E.M. ("Father") appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted permanent custody of N.M., El.M., and J.M. to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm the judgment.

{¶ 2} Mother and Father have three children together, N.M., born February 7, 2009, El.M., born January 6, 2011, and J.M., born September 10, 2013. Mother also has two other children, T.T., born January 27, 2001, and J.T., born November 21, 1996. In 2012, FCCS filed a complaint regarding T.T., alleging the maternal grandfather, P.K., sexually abused T.T. The case was closed for three to four months after P.K. plead guilty to

gross sexual imposition and was sentenced to three years in jail. P.K. was designated a Tier II Sex Offender. The case was reopened in 2014 because the parents requested help with T.T.'s aggressive behavior. In July 2017, T.T. was admitted to a psychiatric hospital and then placed in foster care.

{¶ 3} On August 17, 2017, FCCS filed a complaint under case No. 17JU-10324, alleging that N.M., El.M., and J.M. were neglected children, pursuant to R.C. 2151.03(A)(2) and dependent children pursuant to R.C. 2151.04(C). The complaint consisted of several allegations, including that Father was sexually abusing T.T., that maternal grandfather, P.K., had contact with the children after his release from prison, the home was dirty and infested with cockroaches and bed bugs, and the children were wearing dirty clothes. After a hearing, the court granted a temporary order of custody to FCCS. The parties did not contest the dependency cause of action and the state dismissed the neglect cause of action.

{¶ 4} On October 31, 2017, the trial court adjudicated N.M., El.M., and J.M. dependent children, ordered temporary custody to FCCS, and adopted a case plan. The case plan required Mother to sign releases of information, participate in family counseling, work with a parenting coach, and work with a home base team. The case plan required Father to engage in family counseling, sign releases of information, work with a parenting coach, complete sex offender assessment and follow its recommendations, comply with probation, and work with a home base team. On June 11, 2018, the trial court granted FCCS' motion to extend the temporary custody order.

{¶ 5} On November 8, 2018, Father filed a motion for alternative disposition asking the court to grant him legal custody of the children. On December 13, 2018, FCCS filed a motion requesting an order of permanent custody of the children to FCCS.

{¶ 6} After continuances, the motions proceeded to a hearing beginning January 21, 2020. The court heard the testimony of six witnesses. Mother was the first witness to testify and stated that she has five children, the three children that are part of this complaint and two older children who are half-siblings to the three children. She married Father nine years ago and currently, only J.T., the oldest boy, lives with them because T.T. is in foster care and the three youngest were removed on August 21, 2017 and in foster care. N.M. was placed in the same foster home as his half-sister, T.T., and El.M. and J.M. were placed in a foster home together. Mother currently lives in a two-bedroom

home with her mother, her sister, Father, and her oldest child, J.T. Mother stated FCCS was contacted when she asked for help with T.T. because T.T. was abusing her. Mother testified that she did not know why the children were removed. At that time, they were living on Lilley Avenue. Mother contended the house was "squeakly" clean, except for a roach problem that was resolved, therefore the house was not dirty. (Jan. 21, 2020 Tr. at 13.) On the day the children were removed, they were at her parents' house while her mother and sister were babysitting; however, her father (P.K.) was not present at the home. Mother is not sure if P.K. is guilty of gross sexual imposition but believes he pled guilty to avoid T.T. having to testify.

{¶ 7} After they lived on Lilley Avenue, they moved to a house on Lockbourne Avenue for approximately one month, then they lived with her parents on Meek Avenue, and finally moved to the current two-bedroom house on South Wheatland Avenue owned by her cousin. Mother believes the cousin will renovate and add two more bedrooms. Mother explained the family pools their social security checks to pay expenses. She believes she met the case plan requirements.

{¶ 8} Mother has not been in counseling since July 2018. Mother explained her counselor was criticizing her so Mother fired her and is on the waiting list for a new counselor. She refused a referral to a different agency because she is already familiar with North Central.

{¶ 9} Mother also testified she completed the parenting coach training even though she missed one of the sessions. She did not receive a certificate of completion because the coach wanted her to take the last class, but Mother refused. Mother told the coach not to return to the house because she knew she had passed. Mother testified she is cooperating with home base services.

{¶ 10} Mother and Father were scheduled to visit the children every Friday. They had not seen N.M. in one year because he is "being kept away from the visit" since he is "[m]y informant; he gives me information and what's going on in the [foster] home[s]." (Jan. 21, 2020 Tr. at 40-41.) She and Father had cancelled several visits because it was too hot and two visits due to family problems.

{¶ 11} Father testified that the children were placed in foster homes because he was accused of abusing them and not taking care of them. He denied any abuse. He stated P.K.

was not present on the day the children were removed and he does not believe P.K. abused T.T. or presents a safety risk to the children.

{¶ 12} Initially, there was a sexual offender assessment requirement in the case plan, but Father could not afford that, so it was changed to a psychological assessment. He did not complete the parenting training because he did not feel he needed it. He did not have counseling for two years and refused suggestions for counselors because he does not trust anyone besides the counselors at North Central. On January 2, 2020, just a few weeks prior to the hearing, Father started seeing a psychiatrist.

{¶ 13} Emily Jones, the assigned caseworker,[1] testified regarding the issues that caused the removal of the children which included the home conditions, including trash on the floor, dishes in the sink, the bugs, bedbug bites on the children, and the use of a roaster pan as a cat litter box. Further issues included a sexual abuse allegation against Father, neglect in the home, and hygiene issues. Jones testified there was an inch-thick layer of cockroaches and bedbugs inside the refrigerator in the house on Lilley Avenue. On the day of removal, Jones removed the children from P.K.'s home. El.M. had on one of Father's shirts and a diaper and there was feces on the back of the shirt. Jones stated that N.M. told her he was "supposed to tell you that grandpa [P.K.] wasn't there." (Jan. 21, 2020 Tr. at 87.) There were concerns about the children not progressing and experiencing developmental delays.

{¶ 14} Jones testified that she developed a case plan for the family that was adopted by the court. Father was required to complete a sex offender assessment; comply with probation (for a separate offense) and sign a release of information so Jones could communicate with his probation officer; participate in family counseling; parenting coach training, home base services and follow any recommendations that resulted from the assessments. Mother was required to be available to the Board of Developmental Disabilities; sign releases of information; and participate in parenting and home base services.

{¶ 15} Jones testified that after the children were removed, she did personally help spray their housing for bugs and FCCS helped pay utility bills. FCCS refused to help pay a

---

[1] Jones works for the National Youth Advocate Program, which is a contracting agency that handles some of the ongoing cases on behalf of FCCS. For ease of discussion, further references will be to FCCS.

bill that was in T.T.'s name and a $2,000 cable bill because many of the charges were for pornographic materials.

{¶ 16} Jones would visit the house one to three times per month until the children were removed. She provided food boxes every 30 days. After the children were removed, her supervisor told her not to visit the home because the parents were so irate. However, in November 2018, she did visit and took a Thanksgiving food box and Father became irate and threw his phone because Father wanted P.K. to be able to visit the children. Father told Jones not to return.

{¶ 17} In August 2019, the family was evicted from the Lilley Avenue home. Jones was not able to determine whether the conditions inside the home had improved because she was not permitted inside, only on the enclosed porch. The family moved to Lockbourne Avenue and Jones took bus passes and a food box. The house had fewer bugs. She discussed needing to clean the floor because her flip flops stuck to the carpet. Father testified there was no water to the house while living there. The family then moved to the house on Meek Avenue with Mother's parents, but Jones was not permitted inside. On November 1, 2019, they moved to the South Wheatland Avenue address. Jones was at that residence one time. On November 26, 2019, she made an unannounced visit. Father was irate that she stopped unannounced. Father would not let her see any part of the house other than the living room. Jones stated that the living room was much cleaner. Since maternal grandmother was living there, Jones was concerned that P.K. was also living there. She was also concerned there was no room for the three children in the two-bedroom house. Maternal aunt sleeps in one bedroom and J.T. and Father sleep in the other bedroom. Maternal grandmother has a bed in the living room and Mother sleeps on a futon in the living room.

{¶ 18} Jones explained the supportive services provided by the home base team, including budgeting, obtaining employment, maintaining or obtaining housing, helping to pay bills, and finding community resources for the parents. Jones referred the parents several times. The parents refused employment. On October 25, 2019, the family informed the home base worker that her services were no longer needed.

{¶ 19} The case plan required the children have no contact with P.K. and that the parents protect the children. Despite several conversations with the parents about Jones'

concerns regarding P.K., the parents were not concerned.  During one visitation with the children, the parents had the children Facetime with maternal grandmother and P.K. was in the background.  Afterwards, El.M. pulled her hair out until she explained to her foster parents that she was scared because she knew she was not supposed to have contact with P.K.  After the discussion, El.M.'s destructive behavior ceased.

{¶ 20} Both parents informed Jones they did not feel a need to protect the children from P.K., and they believed he should have access to the children.   Father indicated that he believed P.K. is a good person and should have complete access to the children.

{¶ 21} Jones could not find a place to conduct a sex offender analysis on Father because he has cognitive delays and he was not convicted of a sex offense.  Therefore, the requirement was changed to a psychological assessment. Both parents completed psychological assessments on July 2, 2018.  After the assessment, Jones referred them for parenting coaching and counseling referrals.  Mother refused to attend counseling anywhere other than North Central.  Mother attended counseling from March 2019 until July 2019,[2] but Mother fired her counselor and had to be placed on the waiting list.  Father started seeing a psychiatrist on January 3, 2020.  The parents attended sessions with the parenting coach for six or seven months but when the coach needed to conduct another assessment, the parents became irate and no longer wanted to continue with the parenting coach.  They stopped the service in December 2019 and did not complete the program.

{¶ 22} Father was on probation and Jones requested he sign a release of information, but he did not, therefore, Jones was unable to confirm whether he was compliant with his probation officer.

{¶ 23} When the children were first placed into foster care, the parents visited them consistently.  Since the last court hearing, they attended seven visits, cancelled seven visits, and FCCS cancelled two visits because the girls were sick.  Jones has observed the interaction between the parents and the children during visits and stated that Mother sits away from the children during the visits and does not interact with them.  Initially she interacted more but gradually it has decreased.  Mother does enjoy telling the children about her involvement with Special Olympics basketball or bowling league.  Father

---

[2] Mother originally testified she attended counseling for three months in 2019, but then changed the date to 2018.

interacts with the children more, asking about school, coloring with them, and reading to them. N.M. stopped attending the visits almost one year before the hearing because he does not trust his parents. Jones stated that N.M. refused to leave school to go to the visits. Jones meets with N.M. privately once a month to determine whether he wants to attend the visits again. Jones offered to set up a three-way telephone call, but N.M. refused. N.M. was in counseling until he successfully completed it. During counseling, N.M. wrote a letter to his parents and Father wrote back but N.M. does not want to continue visits.

{¶ 24} Jones stated that she does not see a bond between N.M., El.M. or J.M. and Mother. There is hardly any interaction between J.M. and Mother. Jones testified there is no bond between N.M. and Father. N.M. was very anxious during the visits he did attend. El.M. does not have a bond with Father but does communicate with him. J.M. is not bonded with Father. Jones stated that the length of time the children have been placed outside the home has impacted the bonding issues. All three children are "very bonded to their foster families." (Jan. 21, 2020 Tr. at 134.) Jones visits the foster homes once a month and stated that El.M. has changed the most of the three children. Since her placement in the foster home, El.M. also completed counseling, no longer qualifies to be linked with the Board of Developmental Disabilities, takes pride in her hygiene and self-care, and is performing wonderfully in school. N.M. is thriving in school and in his foster home. J.M. has progressed from being non-verbal to verbal and potty-trained.

{¶ 25} Both homes are possible adoptive homes as the foster parents have expressed a willingness to adopt. FCCS has investigated and has not determined there are any appropriate and willing relatives with whom to place the children. The only relative that is willing is maternal grandfather's brother, but he has a rape conviction. Jones testified that despite her efforts, neither Mother nor Father substantially complied with the case plan. Jones concluded by stating that due to the parents inability to maintain the safety and basic needs of the children, she is requesting FCCS' motion for permanent custody be granted.

{¶ 26} The parent coach, Mary Joe Nyamitambo, was the next witness to testify. She stated she worked with the parents from November 2018 to June 2019. Nyamitambo testified she used books specifically for parents who have developmental delays and covered topics including how to manage children's behavior, ways to maintain bonding and attachment to the children, ways to keep the children safe, ways to develop empathy in

children, ways to manage stress and anger and problem solving skills along with decision making skills, and rewards and punishments. Toward the end of the sessions, she administered an assessment but neither parent received a significant score in all areas to close the case. The parents refused to continue.

{¶ 27} The guardian ad litem ("GAL") testified that N.M. wishes to remain in the foster home and be adopted. N.M. even wants to change his name. The GAL stated that he is not convinced El.M. and J.M. understand the permanency of adoption, but both wish to remain in the care of the foster parents. The GAL recommended that FCCS be granted permanent custody of the children so they can be placed for adoption. This recommendation is based on his belief that the parents do not have the ability to fully protect the children. He has concerns regarding the cleanliness of the home, bugs, and the consistent concern regarding sexual issues. He is concerned that maternal grandfather is classified as a Tier II sex offender and whether the parents would keep the children away from him. The GAL has visited all the family homes and found the recent home on South Wheatland very small. He only entered the living room and kitchen, but the rooms were cluttered, and the floor was not clean. It was habitable, but not appropriate for the children.

{¶ 28} Mother's sister, K.K., also testified. She stated that the parents "[h]ave gone beyond that parenting and that they have - - they have made sure the kids had food, milk and anything else they needed." (Jan. 22, 2020 Tr. at 67.) She has witnessed the girls excitement to see Father at visits and believes all five kids have strong bonds with the parents. Both parents interact with the kids during visits. Although K.K. does not believe P.K. was guilty, she would help keep distance between P.K. and the children. K.K. believes there would be room for the children at the house.

{¶ 29} The trial judge interviewed each child in the presence of the GAL. N.M. told the judge that when he lived with his parents there were bugs everywhere. Father took a picture of "his privates" and sent it to N.M. and he saw Father abuse T.T. (Jan. 21, 2020 Partial Tr. at 20.) N.M. told the judge he does not want to live with Mother and Father and wants to be adopted.

{¶ 30} El.M. explained to the judge that she loves her foster parents and their children. She is sad about Mother and Father because they lied to her and did not give her McDonald's as promised. She wants to live with her foster parents because they take her to

McDonald's. J.M. told the judge she wants to live with Mother and Father because they have candy at their house and give her candy. After a few more questions, J.M. stated she wanted to stay with her foster parents.

{¶ 31} On March 12, 2020, the juvenile court issued a judgment entry denying Father's motion for alternative disposition, granting FCCS' motion for permanent custody and divesting Mother and Father of their parental rights.

{¶ 32} Each parent filed a notice of appeal and the cases were consolidated. Mother assigns the following sole assignment of error:

> The trial court committed reversible error by terminating the Appellant-Mother's parental rights when the decision was against the manifest weight of the evidence.

{¶ 33} Father assigns the following two assignments of error for our review:

> [I.] The agency failed to demonstrate reasonable efforts at reunification.
>
> [II.] The award of permanent custody is against the [manifest] weight of the evidence.

{¶ 34} By her assignment of error and Father's second assignment of error, both Mother and Father challenge the trial court's decision to grant FCCS permanent custody of N.M., El.M., and J.M. under R.C. 2151.414. R.C. 2151.414 governs the termination of parental rights in Ohio. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990). These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Under certain circumstances, therefore, the state may terminate the parental rights of natural parents when it is in the best interest of the children. *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000).

{¶ 35} Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child to grant permanent custody of the child to the

agency, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1)(a) through (e) provides, as follows:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 36} If the juvenile court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, then the trial court examines R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest. Pursuant to R.C. 2151.414(D)(1), in determining a child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 37} Clear and convincing evidence is more than a mere preponderance of the evidence; it concerns that "measure or degree of proof which 'will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 38} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, "[p]ermanent custody judgments which are supported by some competent, credible evidence going to all essential elements of a case will not be reversed as being against the manifest weight of the evidence." *In re A.L.*, 10th Dist. No. 15AP-1040, 2016-Ohio-3189, ¶ 18, citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 39} "[I]n determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct." *In re R.L.*, 10th Dist. No. 07AP-36, 2007-Ohio-3553, ¶ 8, citing *Brofford*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984). Thus, "[i]n reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' "

*J.T.* at ¶ 8, quoting *In re P.G.* 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

{¶ 40} Here, the trial court found clear and convincing evidence established the circumstance described in R.C. 2151.414(B)(1)(d), in that the children "ha[ve] been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period." All three of the children met the criteria of R.C. 2151.414(B)(1)(d), because they had been in FCCS' temporary custody for 12 months of a consecutive 22-month period (August 2017 to trial in January 2020).

{¶ 41} Therefore, the trial court next examined whether a grant of permanent custody is in the best interest of the children (R.C. 2151.414(D)(1)). The trial court reviewed the R.C. 2151.414(D)(1) best-interest factors and found clear and convincing evidence demonstrated that granting FCCS' request for permanent custody was in the best interest of N.M., El.M., and J.M. Both parents contest the trial court's findings under the best-interest factors.

{¶ 42} Initially, we note that R.C. 2151.414(D)(1) contains no requirement that the trial court include an express discussion of each of the best-interest factors, but only requires consideration of such. *In re A.M.*, ___ Ohio St.3d ___, 2020-Ohio-5102, ¶ 31. Here, the trial court did set forth the evidence it relied on in considering the best-interest factors.

{¶ 43} The trial court examined the factors set forth in R.C. 2151.414(D)(1). Under the first best-interest factor, the trial court must consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). In its decision, the trial court documented that N.M. appeared very anxious when he attended visitations and for the year prior to the hearing, he refused to attend visitations. He even refused to participate in a three-way telephone call with them. N.M. has no bond with his parents and refers to them by their first names. Mother refused to accept any responsibility for N.M.'s refusal to visit but, instead, testified that N.M. was

prevented from coming so he could not report on the foster homes to his parents. The court found the parents love the children but had cancelled seven visitations, four visits due to the weather, one visit for a family problem, and one visit due to her mother falling. Father was more engaged during the visits, but Mother usually sat by herself.

{¶ 44} Mother argues there was conflicting testimony regarding the level of engagement and the bond between the children and parents. Further, Mother argues that while N.M. clearly expressed his wishes, Mother contends that a nine-year-old being mad at his parents for not delivering on promises should not be a reason to terminate parental rights. The wishes of the girls were not as clear because of their age. However, there is no indication the trial court did not consider all the testimony. Not only did the caseworker and the GAL testify that the children are not bonded to the parents, but the trial court interviewed all three children. The caseworker and the GAL shared the view that granting FCCS permanent custody was in the children's best interest. As a reviewing court, it is not our province to second-guess the trial court's decisions regarding credibility. *See Davis v. Flickinger*, 77 Ohio St.3d 415 (1997). " '[T]he weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact.' " *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 10, quoting *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 12. "The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures." *Id.*, citing *Seasons Coal Co.* at 80.

{¶ 45} Furthermore, "resolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent." *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. "Courts have considered the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor." *Id.* at ¶ 82, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 59. Although the parents consistently visited the children until the last court hearing, since that time they attended seven visits but cancelled seven visits due to the weather or family emergencies.

{¶ 46} With regard to the second best-interest factor, the trial court must consider, "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). The trial court recognized that all three children are very bonded with their foster parents and the

foster parents expressed a willingness to adopt the children. The GAL testified that N.M. expressed a wish to be adopted, and the GAL did not believe El.M. and J.M. are capable of understanding the permanency of adoption, but they wish to stay with their foster parents. In camera interviews yielded the same responses although J.M. expressed a wish to live with Mother because she has candy, but also expressed a wish to stay with her foster parents.

{¶ 47} The GAL recommended the motion for permanent custody be granted because of the living conditions and environment of the parents' home, allegations of sexual abuse by Father, and the ability of the parents to protect the children from P.K., who is a convicted sex offender.

{¶ 48} The third best-interest factor requires the trial court to consider the custodial history of the children. The trial court noted the children lived with their parents until August 2017 and each has remained in FCCS custody since then, which at the time was more than 12 out of 22 months. Mother argues the trial court did not adequately address the reasons the children had been in the custody of FCCS for 12 out of 22 months and the impact on the children. " 'While the trial court may consider the additional facts beyond the 12-out-of-22 circumstance on its analysis under R.C. 2151.414(D)(1)(c), the court is under no obligation to do so.' " *In re J.H.*, 10th Dist. No. 19AP-517, 2021-Ohio-807, ¶ 45, quoting *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 30, citing *T.M.* at ¶ 19.

{¶ 49} Under the fourth best-interest factor, the trial court must consider "[t]he child[ren]'s need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). The court found that N.M. refuses to visit with the parents and wishes to be adopted and change his name. El.M. and J.M. both wish to remain with their foster parents. Both parents expressed the belief that P.K. does not pose a threat to the children and should have access to them. El.M. displayed behavior issues after the Skype visitation with her maternal grandmother when P.K. could be seen in the background. El.M. expressed a fear to her foster parents of being punished because she knows she is not supposed to interact with P.K. After the discussion with her foster parents, El.M.'s behavioral issues stopped.

{¶ 50} All three children are thriving in their foster homes. N.M. successfully completed counseling and anger management. He is an excellent student and in good health. El.M. is no longer linked with the Board of Developmental Disabilities. She now takes pride in her hygiene and appearance. J.M. is still receiving services from the Board of Developmental Disabilities but appears healthy and is talkative.

{¶ 51} Mother argues the court did not adequately consider the efforts and progress the parents made in order to gain custody of the children. Similarly, Father argues the fourth best-interest factor is the key to this case. Father contends the parents have worked the case plan and completed most of the requirements. They have sufficient financial resources, a small but adequate house, almost completed parenting classes, and have improved cleanliness. They have both obtained counseling. Both parents testified they are committed to protecting the children from maternal grandfather, P.K. Thus, Father argues the evidence is against the manifest weight.

{¶ 52} "In a best-interests analysis under R.C. 2151.414(D), a court must consider 'all relevant factors,' including [the] five enumerated statutory factors. No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 57, quoting R.C. 2151.414(D)(1). In this case, there is no indication the trial court did not consider and weigh the relevant factors in making its determination.

{¶ 53} The parents argue they have completed or almost completed the case plan. However, the testimony supports the finding that the parents have not completed a significant portion of the case plan. Jones testified that even though both parents completed a psychological evaluation, both denied counseling referrals and refused to meet with a counselor other than at North Central. Mother had not been in counseling for a significant period of time and Father had just started seeing a psychologist weeks before the hearing. Although their current house was cleaner than previous locations, the parents would not allow Jones or the GAL to see parts of the house other than the living room. The house was small and cluttered and already had five adults living there. The parents refused to seek employment. The parents did not complete family coaching and refused to continue to attend. They testified they do not need services. The parents also refused to continue working with the home base team. The caseworker and the GAL both testified they are concerned about the parents ability to protect the children from P.K. since both of them

stated they believed P.K. was innocent and does not pose a threat to the children. The GAL also testified he has concerns that the allegations of sexual abuse by Father have persisted over the years, despite not being charged. The parents had not visited the children consistently since the last court date. They had cancelled seven visits, although they attended seven visits and FCCS had to cancel two visits.

{¶ 54} We recognize that the parents completed some of the goals in the case plan. However, " 'while evidence of case plan compliance is relevant to a best-interest determination, it is not dispositive of it.' " *M.W.* at ¶ 57, quoting *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 55. "Moreover, a finding that a parent has satisfied case plan goals does not necessarily equate to a finding that the parent has the ability to assume custody of a child." *J.H.* at ¶ 57, citing *T.M.* at ¶ 31. While the parents have complied with some aspects of the case plan, they have not demonstrated stability or effective parenting skills and refuse to work further with the services. Thus, the manifest weight of the evidence demonstrates the parents are still incapable of giving their children a legally secure permanent placement.

{¶ 55} Under the fifth best-interest factor, the trial court must consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). No evidence was offered regarding any of the factors in divisions (E)(7) to (11) of this section so they do not apply in relation to the parents and children. The trial court found no R.C. 2151.414(E)(7) through (12) factors applied.

{¶ 56} In addition to the foregoing facts, the trial court also considered the GAL's recommendation that the trial court grant FCCS permanent custody. Thus, given this evidence, the court determined that granting FCCS' motion for permanent custody is in the best interest of each child. Upon thorough consideration of the record, we find clear and convincing evidence exists to support the trial court's determination that an award of permanent custody is in N.M, El.M., and J.M.'s best interest. As such, the trial court's decision granting permanent custody to FCCS is not against the manifest weight of the evidence. Mother's sole assignment of error and Father's second assignment of error are overruled.

{¶ 57} By his first assignment of error, Father contends FCCS failed to demonstrate reasonable efforts at reunification. Father argues that pursuant to *C.F.* "the state must still

make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43. Father contends the agency did very little to encourage N.M. to attend visitations and the efforts made were not reasonable.

{¶ 58} Initially, we note the issue of whether the agency made reasonable efforts at reunification only arises at the hearing on a motion for permanent custody if the agency has not established that reasonable efforts were made prior to the hearing. *J.H.* at ¶ 61-64, citing R.C. 2151.419 and *C.F.* at ¶ 43. On July 24, 2018, the magistrate's decision noted that reasonable efforts had been made. However, Father's argument concerns the year prior to the hearing on the permanent custody motion.

{¶ 59} The trial court found that FCCS attempted to ensure the parents had a clear understanding of the expectations and goals of the reunification case plan. Further, Mother testified she understood the case plan and Father testified that Jones explained the case plan and answered questions. Jones testified that during the implementation she delivered a food box every 30 days, delivered bug spray and personally helped clean and spray for bugs, helped with budgeting and paying utility bills, made numerous referrals to counselors, home base services, and parenting coaches. The trial court concluded that FCCS made reasonable efforts to prevent the removal of the children, eliminate the continued removal of the children and safely return the children to the parents' home, and to finalize the permanency plan in effect for the children.

{¶ 60} Specifically, regarding the effort to encourage N.M. to attend visits, Jones testified she speaks to N.M. monthly to encourage him to visit. N.M. explained that he felt his parents lied, he does not trust them, and he does not want to see them. For a long time, she sent a transporter to school to transport N.M. to the visits but he refused to leave school. She suggested telephone calls, but N.M. refused. N.M.'s counselor also spoke to N.M. regarding visits and encouraged him to write his parents a letter. Jones testified she would not force N.M. into the vehicle.

{¶ 61} Father argues this court addressed a similar issue in *In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 22-29, where this court found reasonable efforts occurred despite FCCS' failure to enforce visitation. In that case, in addition to talking to

the children and encouraging them to see their mother, "the agency even went so far as to 'trick' or deceive the boys into a meeting with their mother. The boys believed they were only going to Safe Landings to discuss their report cards, but when they arrived, [their mother] was there for a visit. The caseworker also testified that a plan was implemented as a result of the boys refusing face-to-face contact and/or phone calls with [their mother]. That plan involved writing letters, so [their mother] wrote a letter to the boys, but the boys never responded." *Id.* at ¶ 23-25. This court found that FCCS made reasonable efforts to resolve the threat to the children in order to permit the children to return home, despite the efforts being unsuccessful. *Id.* at ¶ 29.

{¶ 62} Father argues that FCCS in this case did very little to encourage N.M. to return to visits. However, Jones testified she did everything the caseworkers in *D.C.* did, except tricking N.M. into a visit. We find that FCCS made reasonable efforts to encourage N.M. to attend visits, despite the efforts being unsuccessful. Father's first assignment of error is overruled.

{¶ 63} The trial court also determined, pursuant to R.C. 2151.414(D)(2), that granting FCCS' motion for permanent custody was in the children's best interest. R.C. 2151.414(D)(1) and (2) are "alternative means" for determining whether permanent custody is in a child's best interest. *In re J.P.*, 10th Dist. No. 18AP-834, 2019-Ohio-1619, ¶ 39-40 ("In determining the best interest of a child, a juvenile court may apply one of two different tests. Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest. On the other hand, under R.C. 2151.414(D)(2), if the juvenile court makes the four enumerated findings, permanent custody is per se in the child's best interest and the court 'shall' commit the child to the permanent custody of the agency."); *In re M.K.*, 10th Dist. No. 09AP-1141, 2010-Ohio-2194, ¶ 22. Since the trial court in this case determined, pursuant to R.C. 2151.414(D)(1), that permanent custody was in the children's best interest, it was not necessary for the trial court to also conduct an analysis pursuant to R.C. 2151.414(D)(2). However, alternative findings made by the trial court also support granting FCCS' motion for permanent custody.

{¶ 64} Having overruled Mother's sole assignment of error and Father's two assignments of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch is affirmed.

*Judgment affirmed.*

DORRIAN, P.J., and KLATT, J., concur.

_____