[Cite as *In re Bil.I.*, 2023-Ohio-434.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| [Bil.I. et al., | : | Nos. 22AP-127 |
| H.A., Mother, | : | and |
| | | 22AP-138 |
| Appellant, | : | (C.P.C. No. 19JU-3766) |
| S.Y., Father, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In re: | : | |
| [R.I., | : | No. 22AP-137 |
| | | (C.P.C. No. 19JU-3767) |
| H.A., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on February 14, 2023

**On brief:** *William T. Cramer*, for appellant H.A., mother.

**On brief:** *John T. Ryerson*, for appellant S.Y., father.

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant H.A., mother, appeals from judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, issued on February 7, 2022, terminating her parental rights and granting permanent custody of her

minor children, R.I., Y.I., Bin.I., H.I., and Bil.I. to Franklin County Children Services ("FCCS"). Appellant S.Y., father, also appeals from the judgment terminating his parental rights with respect to Y.I., Bin.I., H.I., and Bil.I. For the following reasons, we affirm.

## I. Facts and Procedural History

### A. Removal from home and temporary custody of the children

{¶ 2}   H.A. is the mother of six children: M.M., R.I., Y.I., Bin.I, H.I., and Bil.I. S.Y. is the father of four of H.A.'s children: Y.I., Bin.I., H.I., and Bil.I. The events giving rise to these appeals began in October 2018 when FCCS became aware of an allegation that H.A. had burned M.M. by holding a hot knife on his cheek. H.A. was charged in the Franklin County Municipal Court with criminal offenses related to that allegation and ultimately pled guilty to misdemeanor child endangerment in April 2019.

{¶ 3}   FCCS filed a complaint in the juvenile court on October 23, 2018 asserting M.M. was an abused, neglected, and dependent child based on the injury to his cheek and the presence of healing marks on his stomach, arms, bottom, thighs, and back that were allegedly caused by H.A. whipping him with a cord. FCCS also filed a complaint in the juvenile court alleging R.I. was an abused, neglected, and dependent child based on the presence of a healed scar on her arm that appeared similar to the mark on M.M.'s cheek, and a complaint alleging Y.I., Bin.I., H.I., and Bil.I. were dependent children. The juvenile court issued emergency care orders in all three cases on October 23, 2018 authorizing FCCS to provide temporary care for the children. A magistrate of the juvenile court then issued temporary orders of custody in all three cases on October 25, 2018 granting temporary custody of the children to FCCS.

{¶ 4}   Due to statutory deadlines, FCCS refiled the complaints in January 2019, and a second time in March 2019. The second refiled cases, which are the subject of the present appeals, are Franklin C.P. Nos. 19JU-3766, involving Y.I., Bin.I., H.I., and Bil.I., and 19JU-3767, involving R.I. The second refiling regarding M.M. is case No. 19JU-3763; custody of M.M. has been resolved and is not at issue in the present appeals.[1]

---

[1] In case No. 19JU-3763, the juvenile court granted legal custody of M.M. to his paternal grandmother. *In re M.M.*, Franklin C.P. No. 19JU-3763 (Feb. 7, 2022) (judgment entry). H.A. appealed the juvenile court's decision in that case but ultimately voluntarily dismissed her appeal. *In re M.M.*, 10th Dist. No. 22AP-139 (Apr. 27, 2022) (journal entry of dismissal).

{¶ 5} In case Nos. 19JU-3766 and 19JU-3767, a magistrate of the juvenile court issued temporary orders of custody granting custody of the children to FCCS on March 28, 2019. On June 13, 2019, a magistrate issued decisions terminating the temporary orders of custody, adjudicating the children to be dependent minors,[2] and granting temporary court commitment of custody over the children to FCCS. The juvenile court adopted the magistrate's decisions on June 30, 2019.

{¶ 6} A case plan was filed in both cases on June 20, 2019; among other provisions, it required H.A. and S.Y. to sign all necessary releases of information, maintain stable housing and a legal source of income, be available for announced and unannounced home visits with a caseworker at least monthly to review case plan progress, complete a psychological examination and follow all recommendations, and complete a parenting service and any follow-up recommendations. The case plan also required H.A. to attend medical appointments with the children.

## B. Hearing and permanent custody decisions

{¶ 7} FCCS moved for permanent custody of the children on February 28, 2020, asserting appellants failed to remedy the problems that caused the children to be removed from the home. FCCS alleged appellants failed to timely engage in and complete case plan objectives and subsequent recommendations relating to mental health and parenting practices. The juvenile court conducted a hearing on the motions on August 18, 30, 31, and September 1, 2021.

{¶ 8} Elizabeth Blakley, a caseworker with FCCS, testified she was assigned to the case in May 2021.[3] Blakley and the prior caseworker discussed the case plan with appellants at every home visit; because appellants speak the Somali language, Blakley always used an interpreter for conversations with them. Blakley acknowledged H.A. satisfied many of the requirements of the case plan, including establishing a legal source of income, ensuring stable housing, being available for announced and unannounced home visits, and participating in individual counseling related to concerns with her parenting behaviors. Blakley also testified there were elements of the case plan that appellants had not completed. Based on the initial parenting class, FCCS had requested appellants

---

[2] The magistrate dismissed the abuse and neglect causes of action with respect to R.I. at the state's request.
[3] The prior caseworker did not testify at the permanent custody hearing.

complete a second parenting class; although that request was made in 2019, appellants had not participated in additional parenting training. Blakley testified that H.A. indicated she thought additional parenting classes were unnecessary. Additionally, based on S.Y.'s initial mental health assessment, FCCS also requested that he complete a psychological evaluation. Blakley testified that S.Y. had not completed the psychological evaluation. Blakley also testified there were concerns about appellants' parenting abilities based on Blakley's observations during visitations and H.A.'s denial of the initial harm to M.M. and R.I. that led to removal of the children.

{¶ 9} Each child had been diagnosed with medical or behavioral conditions and was receiving services related to those conditions. Blakley testified H.A. was told of the children's specific needs and that they had medical appointments. Blakley asserted H.A. did not express interest in attending the children's medical appointments.

{¶ 10} Blakley testified she observed appellants and the children during multiple visitations and saw situations where the children were at risk of harming themselves by climbing on or pulling on furniture during the visitations. Blakley testified that H.A. typically engaged with one child at a time, leaving the others to entertain themselves, while S.Y. typically engaged exclusively with Y.I. Blakley testified that Y.I. seemed to have a bond with S.Y., but the other children did not appear to be bonded to H.A. or S.Y. Blakley recommended permanent custody be granted to FCCS because appellants had not addressed the concerns regarding harm to the children that led to their initial removal.

{¶ 11} Stefanie Coe, the guardian ad litem appointed for the children, testified she was assigned to the case a few weeks after it began in October 2018. She observed the children in their foster placements; Y.I. had been placed into a separate foster home, while the other children were together in the same foster home. Coe also observed appellants' visitations with the children. Coe testified regarding the children's wishes for permanent placement and the younger children's inability to articulate their wishes.

{¶ 12} Coe also testified she discussed the children's special needs with appellants on multiple occasions with a translator present. Coe asserted H.A. responded that she would pray about the matter and that the children would grow out of the conditions. Coe claimed appellants had been resistant to participating in additional services, and S.Y. told her appellants would not engage in additional services or programs without a court order.

Coe recommended permanent custody be granted to FCCS because appellants lacked the capacity to provide a safe and protective environment for the children.

{¶ 13} H.A. testified the injury to M.M. occurred while she was cleaning the house; she claimed M.M. placed a knife on the hot stove and then touched the knife to his own cheek. H.A. denied burning M.M. and claimed she pleaded guilty in the criminal case on advice of defense counsel to try to get the children returned home quickly.

{¶ 14} H.A. speaks Somali but also testified that she understands some English. She testified that M.M. and R.I. spoke Somali when they were removed from the home and the other children were too young to speak. She further testified that at the time of the permanent custody hearing the children only spoke English but asserted they understood her when she spoke Somali.

{¶ 15} H.A. testified she understood the case plan and claimed she did everything she was asked to do by the caseworkers. She admitted the caseworkers requested she take a second parenting class but asserted neither caseworker told her where to go for the class. H.A. asserted she had not attended the children's medical appointments because she was not with the children; she claimed that S.Y. was denied permission to attend medical appointments. H.A. testified that if the children were returned, she would be willing to work with a parenting mentor and that she would comply with any follow-up services recommended by FCCS. When asked about the children's medical care, H.A. testified she would do whatever was necessary to provide for their health. However, she also testified she did not believe the children were ill; rather, she believed they were malnourished.

{¶ 16} S.Y. speaks English and Somali and testified he could read English. Regarding the incident leading to removal of the children, S.Y. claimed that R.I. told him M.M. had burned himself while playing with a knife. S.Y. testified he completed a psychological evaluation as part of his case plan compliance. He claimed he participated in individual counseling for several months in 2020 and had begun seeing a counselor again in March 2021. S.Y. testified he was not aware of the children's medical or behavioral needs because he had not been informed of them.

{¶ 17} Zainab Abdul, a Somali-speaking mental health clinician at North Community Counseling Center who worked with appellants, also testified at the hearing. Abdul began working with appellants in late-March or early-April 2021. She engaged in

weekly individual counseling with each of the appellants, and attended weekly visitation sessions with the children. Abdul testified that based on her advice, S.Y. had become more active and involved during visitations. Abdul also testified that H.A. interacted with the children during visitations. Abdul asserted that from April through August 2021, the interactions between appellants and the children during visitations improved. Abdul opined that increased visitation and longer visits would allow for more interaction and improved communication between appellants and the children. Abdul testified the interactions between appellants and the children were positive and she believed the children were bonded to appellants.

{¶ 18} Abdul asserted she consulted with appellants' prior parenting trainer in an attempt to find other resources and claimed appellants were always receptive to receiving more parenting training. Abdul testified that cultural differences accounted for some of the parent-child interactions observed by Blakley and Coe, asserting that Somali culture involved a more "hands-off" approach to parenting. Abdul asserted these cultural differences could increase with the children being placed in non-Somali foster homes. Abdul stated she would be available to continue working with the family if the children were returned to appellants. On cross-examination, Abdul conceded that she believed appellants needed additional services and training regarding the children's behavioral needs before they were ready to parent the children without FCCS's support.

{¶ 19} The juvenile court issued a combined decision in case Nos. 19JU-3766 and 19JU-3767 granting permanent custody of R.I., Y.I., Bin.I, H.I., and Bil.I. to FCCS. The court concluded appellants failed to timely engage and complete the case plan objectives related to mental health and parenting practices. The court found the children met the statutory criteria for permanent custody and that it was in the children's best interest to terminate H.A.'s and S.Y.'s parental rights and commit the children to the permanent custody of FCCS.

## II. Assignments of error

{¶ 20} H.A. appeals the juvenile court's decision in case Nos. 19JU-3766 and 19JU-3767 and assigns the following three assignments of error for our review:

> [I.] The agency did not demonstrate reasonable efforts at reunification.

[II.] The weight of the evidence does not support the award of permanent custody.

[III.] The juvenile court's permanent custody entry fails to adequately address the best interest factors.

{¶ 21} S.Y. appeals the juvenile court's decision in case No. 19JU-3766 and assigns the following three assignments of error for our review:

[I.] The court below erred in granting Permanent Court Commitment (PCC) through failing to find that due to sufficient case plan progress, the children could and should be reunited with their parents within a reasonable amount of time.

[II.] The court below erred in granting PCC because Franklin County Children Services (FCCS) failed to take reasonable efforts to reunify the children with their parents, because FCCS failed to provide culturally sensitive and appropriate services to the family.

[III.] The court below erred in failing to address anywhere in its Decision and Judgment Entry the country of origin or cultural heritage of the parents.

## III. Analysis

## A. Applicable law governing termination of parental rights

{¶ 22} "Parents have a 'fundamental liberty interest' in the care, custody, and management of [a] child." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Santosky v. Kramer, Commr., Ulster Cty. Dept. of Social Servs.*, 455 U.S. 745, 753 (1982).  Accordingly, "[t]he right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6.  That right is not unlimited, however, and the state has broad authority to intervene to protect children from abuse and neglect.  *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 23.  As an "alternative of last resort * * * only justified when it is necessary for the welfare of the children," a court may terminate parental rights and commit a child to the permanent custody of a public children services agency.  *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.  Because of the extreme nature of this remedy, which has been

likened to the family law equivalent of the death penalty, parents must be afforded every procedural and substantive protection authorized by law. *L.B.* at ¶ 22.

{¶ 23} The trial court may grant permanent custody of a child to a public children services agency if the court determines by clear and convincing evidence that: (1) it is in the child's best interest, and (2) one of the factors contained in R.C. 2151.414(B)(1) applies. R.C. 2151.414(B)(1); *Id.* at ¶ 24. In determining whether granting permanent custody is in the child's best interest, the court must consider all relevant factors, including specific factors set forth in R.C. 2151.414(D)(1)(a) through (e). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**B. Standard of review for a grant of permanent custody**

{¶ 24} On appeal, we will not reverse a trial court's decision on a permanent custody motion unless the decision was against the manifest weight of the evidence. *L.W.* at ¶ 8. " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "[I]n reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *L.B.* at ¶ 27. We must make every reasonable presumption in favor of the trial court's findings of fact and judgment and, if the evidence is susceptible to more than one construction, give it the interpretation most consistent with the trial court's verdict and judgment. *Id.* at ¶ 28. Moreover, we have held that a juvenile court's discretion in determining whether permanent custody is in a child's best interest " ' "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." ' " *In re*

*A.L.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8, quoting *In re Hogle*, 10th Dist. No. 99AP-944 (June 27, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist.1994).

## C. Whether FCCS demonstrated reasonable efforts at reunification

{¶ 25} We begin with H.A.'s first assignment of error and S.Y.'s second assignment of error, in which they argue FCCS failed to demonstrate reasonable efforts at reunifying the children with appellants. Because these assignments of error raise similar issues, we will address them together.

{¶ 26} Appellants are from Somalia. H.A. only speaks the Somali language, although she testified she understands some English. S.Y. speaks Somali and some English. Appellants argue that language and cultural issues affected their efforts to complete the case plan and regain custody of the children. They assert FCCS failed to provide translated copies of relevant documents, medical records, and medical appointment notices. Appellants further assert the only uncompleted parts of their case plan consisted of additional counseling and parenting classes, but that FCCS failed to make referrals for culturally appropriate resources to meet those requirements. Appellants argue FCCS cannot be found to have made reasonable efforts at reunification when it failed to make appropriate referrals so the case plan requirements could be fulfilled. Finally, appellants argue the children lost the ability to speak or understand Somali while in foster care, leading to communication difficulties between appellants and the children. Appellants assert that FCCS's failure to support Somali-language development in the children while in foster care did not demonstrate reasonable efforts toward reunification.

{¶ 27} Appellants' arguments relate to the "reasonable efforts" requirement contained in R.C. 2151.419(A)(1), which provides that, at specified hearings, the juvenile court must determine whether a public children services agency "has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The agency bears the burden of proving it has made reasonable efforts. R.C. 2151.419(A)(1). An agency may not file a motion for permanent custody "[i]f reasonable efforts to return the child to the child's home are required under [R.C. 2151.419, and] the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." R.C. 2151.413(D)(3)(b).

{¶ 28} By its own terms, R.C. 2151.419(A)(1) applies at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41. Because R.C. 2151.419(A)(1) does not refer to permanent custody hearings, it "does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *Id.* at ¶ 43. However, an agency "must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights." *Id.* If an agency has not established prior to a permanent custody hearing that it undertook reasonable efforts to reunify the family, it must demonstrate those efforts at the permanent custody hearing. *Id. See also In re N.M.*, 10th Dist. No. 20AP-158, 2021-Ohio-2080, ¶ 58 ("[T]he issue of whether the agency made reasonable efforts at reunification only arises at the hearing on a motion for permanent custody if the agency has not established that reasonable efforts were made prior to the hearing."); *In re A.N.F.*, 10th Dist. No. 17AP-905, 2018-Ohio-3689, ¶ 21 (explaining that R.C. 2151.419(A)(1) does not apply in a permanent custody hearing because the agency must have proven reasonable efforts prior to filing a motion for permanent custody).

{¶ 29} As part of its permanent custody ruling in this case, the juvenile court found FCCS made reasonable efforts to prevent or eliminate the need for removal of the children from their home and return them to H.A.'s care. Appellants challenge that finding on appeal. However, the record reflects that the juvenile court also made reasonable efforts findings in several rulings *prior to* FCCS's motion for permanent custody. On June 30, 2019, the court adopted magistrate's decisions finding that the children were dependent minors. In those decisions, the magistrate found that reasonable efforts had been made to prevent or eliminate the need for removal of the children from their home. Subsequently, in October 2019, the juvenile court adopted magistrate's decisions following a hearing on FCCS's motion for extension of temporary custody. In those decisions, the magistrate again found that reasonable efforts had been made to prevent or eliminate the need for removal of the children from their home. Neither H.A. nor S.Y. filed objections to those earlier magistrate's decisions or appealed the juvenile court decisions adopting them. *See In re J.H.*, 10th Dist. No. 19AP-517, 2021-Ohio-807, ¶ 65 (noting that mother did not object to or

appeal from judgments adjudicating children as dependent and granting temporary custody to FCCS and finding that reasonable efforts to prevent removal had been made). The trial court's earlier judgments "satisfied R.C. 2151.419(A)(1), thus relieving the trial court from the obligation to make a reasonable-efforts finding in the permanent custody judgment." *Id.* Therefore, it was unnecessary for the trial court to make a reasonable efforts finding in the permanent custody decision.

{¶ 30} "We cannot reverse a judgment based on an alleged error in a finding that the trial court never had to make in the first place." *Id.* at ¶ 66. *See also In re V.W.*, 10th Dist. No. 21AP-437, 2022-Ohio-2487, ¶ 48, citing *J.H.*. As discussed below, we recognize the potential for language and cultural challenges to reunification under the circumstances in these cases. However, if appellants sought to challenge the trial court's findings that FCCS engaged in reasonable efforts to reunify the family, that issue should have been raised in objections to the earlier magistrate's decisions or in an appeal from the trial court's decisions adopting those magistrate's decisions. *See, e.g.*, *In re B.F.*, 3d Dist. No. 11-21-04, 2021-Ohio-4251, ¶ 20 ("In this case, the trial court's first four reasonable-efforts findings either preceded or were contained within the trial court's judgment entries of adjudication and disposition. Consequently, any error in the trial court's first four reasonable-efforts findings could have been raised in a timely appeal from B.F.'s adjudication and initial disposition."); *In re E.R.*, 10th Dist. No. 17AP-82, 2017-Ohio-7188, ¶ 54 (noting that no objections were made to magistrate's decisions extending temporary custody and finding that reasonable efforts had been made to achieve reunification; therefore, the reasonable efforts requirement of R.C. 2151.419(A)(1) was satisfied). Because appellants failed to object to or appeal the earlier reasonable efforts findings at the time they were made, they cannot challenge those findings now.[4]

---

[4] We note that the question of whether the October 2019 decision was a final, appealable order is not squarely before us in the present appeal. However, in addition to the cases we cite above which suggest the time to appeal earlier findings regarding reasonable efforts would be at the time the findings are made, we do not believe *In re Adams*, 115 Ohio St.3d 86, 2007-Ohio-4840, suggests otherwise in a case where parents, rather than a public children services agency, appeal.

**{¶ 31}** Accordingly, we overrule H.A.'s first assignment of error and S.Y.'s second assignment of error.

## D. Whether the children could be reunited with appellants within a reasonable time

**{¶ 32}** We next turn to S.Y.'s first assignment of error, in which he argues the trial court erred by granting permanent custody to FCCS because the children could have been reunited with appellants within a reasonable time. S.Y. claims he complied with the case plan requirements and cites Abdul's testimony that the parents' interaction with the children during visitation had improved over time. S.Y. argues this evidence establishes the children could have been returned home within a reasonable time and therefore it was improper to grant permanent custody to FCCS.

**{¶ 33}** Before granting permanent custody to an agency, the court must find that one of the factors set forth in R.C. 2151.414(B)(1) applies to the child. S.Y.'s argument appears to relate to R.C. 2151.414(B)(1)(a), which applies when a child is "not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period, * * *

---

*Adams* involved an appeal by a public children services agency from an order denying its motion to convert temporary custody to permanent custody and ordering the continuation of temporary custody with parental visitation. *Id*. at ¶ 2. Ultimately, the Supreme Court of Ohio concluded that "a trial court order denying the motion of a children-services agency to modify temporary custody to permanent custody and continuing temporary custody is not a final, appealable order under R.C. 2505.02(B)(1) or (2)." *Id*. at ¶ 45. A key factor in the court's analysis was that "no constitutional provision, statute, rule of common law, or procedural rule entitles a children-services agency to any inherent right to raise a child to adulthood." *Id*. at ¶ 43; *see also id*. at ¶ 42 ("Equally important to our determination of whether an order is a final, appealable order under R.C. 2505.02(B)(1) and controlling in our discussion of a final, appealable order under R.C. 2505.02(B)(2) is the fact that a children-services agency does not have a substantial right in the permanent custody of children based on the fact that the agency has temporary custody of the children."). The court noted that "[i]n contrast, a parent has a substantial right in custody." *Id* at ¶ 43. Thus, the *Adams* decision suggests the analysis might differ in the event of an appeal by a parent, who has a substantial right to custody of a child. Additionally, decisions from several Ohio appellate courts suggest that an order extending temporary custody may be a final, appealable order when appealed by a parent. *See In re Patterson*, 16 Ohio App.3d 214, 215 (12th Dist.1984) (holding that a further dispositional order continuing an original temporary custody order was a final, appealable order because it was inextricably a part of, incidental to, and in implementation of the original judgment); *see also Murray*, 52 Ohio St.3d at 159, fn. 2 (favorably citing *Patterson*); *In re N.C.*, 11th Dist. No. 2022-A-0015, 2022-Ohio-4569, ¶ 23 (holding that an extension of a temporary custody order issued subsequent to a finding of dependency, neglect, or abuse is a final, appealable order); *In re D.J.*, 8th Dist. No. 107203, 2019-Ohio-1645, ¶ 24-25 (distinguishing *Adams* and holding that an order continuing temporary custody was a final, appealable order under R.C. 2505.02(B) in an appeal filed by the child's mother); *In re D.M.*, 12th Dist. No. CA2017-12-017, 2018-Ohio-2260, ¶ 15 (citing *Patterson* and holding that "an additional dispositional order continuing an original temporary custody order constitutes a final appealable order"); *In re Di.R.*, 8th Dist. No. 85765, 2005-Ohio-5346, ¶ 30 (citing *Patterson* and holding that "any order extending an original temporary custody order is itself a final appealable order").

and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." Factors to be considered in determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent are set forth in R.C. 2151.414(E). S.Y. appears to argue the trial court erred by concluding R.C. 2151.414(B)(1)(a) applied to the children.

{¶ 34} We need not reach S.Y.'s argument, however, because it is clear and undisputed that another of the R.C. 2151.414(B)(1) criteria applied to the children. Under R.C. 2151.414(B)(1)(d), permanent custody may be granted when a child "has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d). When that provision applies, an agency need not prove that the child cannot be placed with the parents within a reasonable time or should not be placed with the parents. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 21; *In re B.R.*, 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 46.

{¶ 35} A juvenile court magistrate issued emergency care orders placing the children in FCCS's custody on October 23, 2018, and first issued temporary orders of custody granting custody of the children to FCCS on October 25, 2018. Following dismissal and refiling, a juvenile court magistrate again issued temporary orders of custody granting custody of the children to FCCS on March 28, 2019. On June 13, 2019, a magistrate issued decisions terminating the temporary orders of custody, adjudicating the children to be dependent minors, and granting temporary court commitment of custody over the children to FCCS. The juvenile court then adopted the magistrate's decisions on June 30, 2019. FCCS moved for permanent custody of the children on February 28, 2020, more than 16 months after the initial temporary orders of custody were issued. In their briefs, both S.Y. and H.A. concede the children had been in the temporary custody of FCCS for more than 12 months in a 22-month period. Because R.C. 2151.414(B)(1)(d) applied to the children, the trial court was not required to determine whether R.C. 2151.414(B)(1)(a) also applied to them.

{¶ 36} Accordingly, we overrule S.Y.'s first assignment of error.

**E. Whether the trial court erred by concluding it was in the children's best interest to grant permanent custody to FCCS**

{¶ 37} Finally, we consider appellants' remaining assignments of error, which we will address together because they are related. In her second assignment of error, H.A. asserts the weight of the evidence did not support an award of permanent custody to FCCS. In her third assignment of error, H.A. argues the trial court failed to adequately address whether permanent custody was in the children's best interest. S.Y. raises a similar argument in his third assignment of error, arguing the trial court erred by failing to refer to appellants' country of origin or culture.

{¶ 38} As explained above, it is undisputed that the children had been in FCCS's custody for more than 12 months in a consecutive 22-month period. The crux of appellants' challenge, therefore, is whether the trial court erred by concluding that granting permanent custody to FCCS was in the children's best interest. In determining whether permanent custody is in a child's best interest, the trial court must consider all relevant factors, including five specific factors set forth in R.C. 2151.414(D)(1)(a) through (e). No single factor is given greater weight than the others. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. On appeal, we must determine whether the trial court's conclusion regarding the child's best interest was supported by the manifest weight of the evidence. *L.B.* at ¶ 29.

**1. The children's interactions and relationships**

{¶ 39} The first factor in determining whether permanent custody is in a child's best interest requires the court to consider the interaction and interrelationship of the child with the parents, siblings, relatives, foster caregivers, and others. R.C. 2151.414(D)(1)(a). The juvenile court concluded the children were not bonded with appellants. The court further concluded the children were bonded with and interacted well with their foster parents, and were thriving in their foster placements.

{¶ 40} Blakley testified about the three visitation sessions she observed in May, June, and July 2021. Blakley stated that during those visitations, H.A. would typically engage in play with one child at a time and leave the other children to entertain themselves. Blakley testified that during the May and July visitations, S.Y. engaged exclusively with Y.I., and that he was not present for most of the June visitation because he left to buy the

children food.  Based on her observations, Blakley testified that Y.I. seemed bonded to S.Y., but that none of the other children seemed bonded to either of the appellants.  Blakley asserted the children were more engaged with their siblings during visits than with appellants. Blakley also testified about the relationship between the children and their foster parents, testifying that R.I., Bin.I., Bil.I., and H.I. were very bonded with their foster parents and comfortable interacting with them.  The foster parents were interested in adopting R.I., Bin.I., Bil.I., and H.I.  Blakley further testified that Y.I., who was in a different foster placement than the other children, had very positive interactions with his foster parent.[5]  Similarly, Coe testified that, based on her observations, the children were not bonded with either of the appellants.  By contrast, Abdul testified that the interactions between appellants and the children improved during the time she observed visitations and that the children were bonded with appellants.

**2. The children's wishes**

{¶ 41} The second factor in determining whether permanent custody is in a child's best interest requires considering the wishes of the child, as expressed by the child or through the guardian ad litem, with regard for the child's maturity.  R.C. 2151.414(D)(1)(b).

{¶ 42} Coe testified she had "very specific and clear conversations" with R.I. about her wishes, and that R.I. did not want to return to H.A.'s care.  (Sept. 1, 2021 Tr. at 36.)  Coe testified R.I. expressed a clear desire to be adopted by her foster family.  Coe stated that although Y.I. was five years old and would be expected to be able to express his wishes, she did not believe he understood and was able to comprehend the concept of permanent custody. Therefore, Coe asserted Y.I. was not capable of making his wishes known. Similarly, the other children, who were younger than Y.I., were not capable of expressing their wishes.  Coe recommended that permanent custody of all the children be granted to FCCS, based on her belief that appellants could not provide a safe and protective environment.

---

[5] We note that Blakley and Coe offered conflicting testimony regarding whether Y.I.'s foster placement was a prospective adoptive home. Blakley testified the foster parent was not interested in adopting Y.I. However, Coe testified that although the foster parent generally had not adopted children who had been placed with her, she was "not interest[ed] in having [Y.I.] removed" from the home and was "definitely considering" applying to adopt Y.I. if he became available for adoption. (Sept. 1, 2021 Tr. at 13.)

### 3. The children's custodial history

{¶ 43} The third factor in determining a child's best interest is the child's custodial history, including whether the child has been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c). The juvenile court found the children had been in the temporary custody of FCCS continuously since October 23, 2018. That was more than 16 months prior to the motion for permanent custody and more than 39 months prior to the juvenile court's decision. Appellants do not contest that the children had been in the custody of FCCS more than 12 months of a consecutive 22-month period.

### 4. Whether a legally secure placement could be achieved without granting permanent custody to FCCS

{¶ 44} The fourth factor in determining whether permanent custody is in a child's best interest requires considering the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. R.C. 2151.414(D)(1)(d). The juvenile court concluded the children were desperately in need of a secure placement and that the evidence supported FCCS's claim that a secure placement could not be achieved without granting permanent custody to FCCS.

{¶ 45} In her second assignment of error, H.A. argues appellants completed most of their case plan requirements except for additional counseling and a second parenting class. Appellants claim they were participating in additional individual counseling at the time of the permanent custody motion, and that FCCS failed to provide a referral for an additional parenting class, leaving appellants and Abdul to find one on their own. H.A. asserts that even though they were unable to find a second parenting class, Abdul attended visitations and provided appellants with advice and assistance. H.A. claims the trial court failed to address Abdul's testimony, which indicated that appellants had made progress and visitations had improved over time.

{¶ 46} Although there was evidence that appellants completed many of their case plan requirements, " 'evidence of case plan compliance is relevant to a best-interest determination, [but] is not dispositive of it.' " *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 57, quoting *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 55.

Moreover, the trial court concluded appellants failed to complete certain case plan objectives related to mental health and parenting practices. Blakley testified that based on H.A.'s psychological evaluation, the prior caseworker recommended H.A. participate in additional individual counseling and an additional parenting course. Similarly, based on an initial mental health assessment, it was recommended S.Y. complete a psychological evaluation and participate in additional parenting classes with H.A. Both H.A. and S.Y. indicated to Blakley that they felt the additional parenting classes were unnecessary. Blakley did not make a specific referral for the additional parenting course because Abdul was attempting to find culturally specific resources for appellants. Appellants had not completed the additional parenting course by the time of the permanent custody hearing.

{¶ 47} Blakley testified she had concerns regarding appellants' abilities to provide for the children's basic needs and ensure appropriate supervision of the children. R.I. was receiving speech and mental health therapy due to a diagnosis of expressive language disorder. Bin.I. and H.I. were receiving speech, mental health, and occupational therapy due to diagnoses of mixed receptive expressive speech disorder. Bil.I. was receiving speech, occupational, and physical therapy due to diagnoses of autism, mixed receptive expressive speech disorder, and hypotonia. Y.I. was in the process of being assessed for attention deficit and hyperactivity disorder. Blakley asserted she discussed the children's special needs with appellants at every visit. During a visit in May 2021, Blakley and Coe discussed the children's needs, including safe and appropriate supervision and the significant support services the children were receiving. Blakley testified that in response, H.A. indicated she would pray about it and that the children would grow out of the conditions. Coe similarly testified that when the children's specific needs were discussed, H.A. responded she would pray and the conditions would go away, and that the children would grow out of the conditions. Coe acknowledged H.A. had completed many requirements of the case plan, but testified that "almost three years later there's no protective capacity to understand the needs of these kids, the needs of kids in general and how to ensure that they are safe." (Sept 1, 2021 Tr. at 33.)

{¶ 48} Blakley testified there were some relatives that were investigated as potential kinship placements for the children, but none of the relatives passed a background check and home study indicating they would be safe placements.

### 5. The presence or absence of certain statutory factors involving criminal offenses, harm to a child, or prior loss of parental rights

{¶ 49} The final enumerated factor in determining whether permanent custody is in a child's best interest is whether any of the factors in R.C. 2151.414(E)(7) through (11) apply in relation to the parents and child. R.C. 2151.414(D)(1)(e). Those factors apply when a parent has been convicted of or pleaded guilty of certain criminal offenses, has repeatedly withheld medical treatment or food from a child, has placed a child at substantial risk of harm multiple times due to alcohol or drug abuse and refused to participate in treatment, has abandoned the child, or has had parental rights involuntarily terminated with respect to a sibling of the child. The trial court found that R.C. 2151.414(E)(10) applied with respect to R.I.'s father because he had abandoned her, but did not find that any of the factors applied to H.A. or S.Y.

### 6. All other relevant factors

{¶ 50} In addition to the five enumerated factors, the statute provides that in determining the best interest of a child, the juvenile court shall consider "all relevant factors." R.C. 2151.414(D)(1). Appellants assert the trial court failed to properly consider all relevant factors because its decision did not address the cultural and language issues present in these cases. Appellants argue the juvenile court failed to mention in the decision that they are from Somalia and primarily speak the Somali language. They further argue the juvenile court failed to discuss any efforts by FCCS to overcome cultural or language issues and failed to address Abdul's testimony related to those issues.

{¶ 51} Appellants cite our decision in *In re T.W.*, 10th Dist. No. 19AP-700, 2020-Ohio-4712, in support of their argument that the trial court failed to adequately consider the children's best interest because it failed to address the cultural and language issues in this case. In that case, this court reversed and remanded a permanent custody decision because it could not be certain the trial court correctly analyzed the statutory best interest factors based on the trial court's judgment entry. *Id.* at ¶ 14. Like the present case, the mother in *T.W.* was from Africa, and the permanent custody decision failed to mention language and cultural issues preventing reunification. *Id.* at ¶ 13. However, the failure to address language and cultural issues was only one of several problems leading to reversal in that case. The juvenile court's entry contained no observations about the mother's

interaction with the child, failed to state the child's wishes for placement despite there having been an in camera interview, and failed to reach a conclusion about whether a legally secure placement could be achieved without granting permanent custody to the agency. *Id.* Thus, the juvenile court decision in *T.W.* completely failed to address three of the enumerated factors set forth in R.C. 2151.414(D)(1). In the present case, by contrast, the juvenile court addressed all the specific enumerated factors under the statute. Accordingly, our decision in *T.W.* does not compel a remand of these cases.

{¶ 52} Although *T.W.* does not compel a remand, we acknowledge the language and cultural issues present in these cases. There was evidence that H.A. only spoke Somali, while S.Y. spoke Somali and some English. Blakley and Coe testified they always used an interpreter when communicating with appellants. Appellants argue on appeal they were not provided with translated written copies of documents; however, there is no indication appellants ever *requested* translated documents. Moreover, S.Y. testified at the hearing that he could read English, but it was difficult for him to read Somali. Coe testified it was her understanding that H.A. could not read English or Somali. Thus, it is unclear how much appellants would have benefitted from translated written documents. Abdul testified regarding cultural differences between American and Somali parenting styles and suggested placement in non-Somali foster homes could result in communication difficulties between appellants and the children. We note, however, that appellants did not being working with Abdul until Spring 2021, more than one year *after* FCCS filed the motion for permanent custody. Blakley also conceded the children not speaking Somali could cause communication problems, but she asserted she did not observe much impact from that on appellants' interactions with the children during visitations. Similarly, H.A. testified that the children understood her even though they did not speak Somali.

**7. Conclusion regarding the juvenile court's best interest analysis**

{¶ 53} As explained above, the standard of review for a permanent custody decision is deferential and we must accord the utmost respect to juvenile court's discretion in determining whether permanent custody is in a child's best interest. *A.L.D.* at ¶ 8. No single factor is given greater weight than any other in determining a child's best interest. *Schaefer* at ¶ 56.

{¶ 54} Based on our review of the evidence and testimony introduced at the hearing before the juvenile court, we find that despite the trial court's failure to expressly address the language and cultural issues present in these cases, there was competent, credible evidence to support the court's conclusion that granting permanent custody to FCCS was in the children's best interest.[6] The children had been in temporary custody for an extended time. Emergency care and temporary custody were first ordered in October 2018, shortly after the first complaints were filed. The complaints were refiled in January and March 2019. Both the Blakley and Coe testified the children were bonded with each other and their foster families; apart from Y.I. and S.Y., the children were not bonded with appellants. R.I. directly indicated she wanted to be adopted, while the other children were incapable of

---

[6] We note that the majority in *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, concluded that a juvenile court is not required to expressly discuss every fact it relied on in reaching a best-interest conclusion:

> Based on the plain and unambiguous statutory language, and consistently with our treatment of the word "consider" in other contexts, we hold that R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires. Although a reviewing court must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors, we may not graft onto the statute a requirement that the court include in its decision a written discussion of or express findings regarding each of the best-interest factors.

*A.M.* at ¶ 31. *See also In re A.H.*, 10th Dist. No. 20AP-281, 2021-Ohio-1040, ¶ 35 ("[T]he Supreme Court of Ohio recently held that R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor enumerated in the statute; the statute only requires the court to *consider* those factors."). (Emphasis sic.)

We agree, as did the majority in *A.M.*, that the better practice is for a juvenile court to provide a thorough discussion of the best-interest factors and the evidence relied on to support its conclusions. *See A.M.* at ¶ 32 ("As we have done when addressing other statutes that require a court to consider specific factors, we emphasize that the best practice is for the juvenile court to specifically address each factor. * * * Discussion of the statutory best-interest factors in R.C. 2151.414(D)(1) would similarly facilitate appellate review of permanent-custody judgments. * * * A juvenile court's including a discussion of the best-interest factors in its decision granting permanent custody of a child to an agency is also likely to increase public confidence in the judicial process in this most important area of parental rights."); *J.H.*, 2021-Ohio-807, at ¶ 42 ("Here, however, the trial court followed best practices: it set forth the evidence it relied on when considering the R.C. 2151.414(D)(1)(b) best-interest factor.").

In this case, the juvenile court expressly stated it had thoroughly reviewed the testimony and evidence and that "[t]he omission of a specific finding herein as to every piece of evidence presented should not and does not suggest that the Court did not consider a fact and/or evidence in arriving at the ultimate decision herein." (Decision & Jgmt. Entry at 18.) Accordingly, consistent with the holding of *A.M.*, we reject the dissent's assumption that the juvenile court did not consider specific evidence simply because it was not expressly mentioned in the juvenile court's decision.

expressing their wishes. The children had significant medical and behavioral needs. The hearing on the permanent custody motions was held almost three years after emergency care and temporary custody were first ordered, and still appellants failed to show that they fully satisfied the requirements of the case plan and failed to demonstrate they could provide care that would meet the children's needs. Under these circumstances, we cannot conclude the juvenile court clearly lost its way in concluding it was in the children's best interest to grant permanent custody to FCCS.

{¶ 55} Although we agree with appellants that cultural and language issues in a permanent custody case may be significant and may require consideration by the juvenile court, we also find, as outlined above, that competent, credible evidence related to the other best interest factors supported the juvenile court's decision. Given the juvenile court's analysis of the other statutory factors, appellants fail to demonstrate that the court's analysis would have changed or that the juvenile court clearly lost its way by failing to expressly address the cultural and language issues in its judgment entry.

{¶ 56} Accordingly, we overrule H.A.'s second and third assignments of error and S.Y.'s third assignment of error.

## IV. Conclusion

{¶ 57} For the foregoing reasons, we overrule H.A.'s three assignments of error and S.Y.'s three assignments of error and affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

BEATTY BLUNT, P.J., concurs.
MENTEL, J., dissents.

MENTEL, J. dissenting.

{¶ 58} H.A.'s first assignment of error and S.Y.'s second assignment of error argue that FCCS failed to engage in reasonable efforts at family reunification. Applying the doctrine of waiver (without so stating), the majority overrules them. I dissent from the majority's refusal to address this issue.

{¶ 59} As the majority notes, "the juvenile court found FCCS made reasonable efforts to prevent or eliminate the need for removal of the children from their home and return them to H.A.," and it did so "[a]s part of its permanent custody ruling in this case."

(Majority Opinion at ¶ 29.)  These findings were more than a "part" of the juvenile court's findings.  Section II of its Decision and Judgment Entry is captioned "Relevant Findings Pursuant to Statute," and, under that, Subsection A is captioned "Reasonable Efforts."  The "Reasonable Efforts" findings are nearly three pages and constitute almost the entirety of the juvenile court's findings.  The rest are in Section I, captioned "Relevant Background and Procedural History," consisting of only two paragraphs summarizing the vital statistics of the children and the adjudication of dependency arising from the physical abuse of their sibling.  The remaining three subsections in Section II purport to "consider" the relevant factors under R.C. 2151.414(B) and (D), for the most part by simply stating "[p]lease see Section I and II above," in spite of the fact that these subsections are themselves part of Section II.  The only way to affirm the juvenile court's consideration of the statutory factors is to infer that the reference is actually to the "Reasonable Efforts" subsection, as that is the only part of the juvenile court's decision containing anything resembling findings.  And to be fair, in spite of the confusingly titled caption of the section, many of the findings in the narrative presented there form the basis for the juvenile court's "consideration" of the factors under R.C. 2151.414(B) and (D).

{¶ 60}  Putting the confusion of the juvenile court's decision aside for the moment, it must be emphasized that what the juvenile court calls its reasonable efforts findings are the bulk of its findings in the final judgment entry.  Nevertheless, the majority holds that appellants are precluded from challenging them on appeal.  Why?  Because appellants failed to appeal from either the June 30, 2019 decision adjudicating the children dependent minors and awarding temporary custody to FCCS, or from the October 24, 2019 decision extending temporary custody, as both contained findings "that reasonable efforts had been made to prevent or eliminate the need for removal of the children from their home." (Majority Opinion at ¶ 29.)

{¶ 61}  Of these two decisions, only the first was unambiguously a final appealable order that appellants could have appealed.  *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), syllabus ("An adjudication by a juvenile court that a child is * * * 'dependent' as defined in R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a 'final order' within the meaning of R.C. 2505.02 and is appealable to the court of appeals

pursuant to R.C. 2501.02.").  In contrast, the October 24, 2019 decision stated findings on reasonable efforts at reunification, but it was merely an order extending temporary custody under R.C. 2151.415(D)(1).  The majority improperly extends the holding of *In re J.H.*, 10th Dist. Nos. 19AP-517, 2021-Ohio-807, when stating that appellants needed to object or appeal from the October 24, 2019 decision extending temporary custody.  *J.H.* only held that the appellant had failed to challenge the reasonable efforts finding in an initial judgment "adjudicat[ing] the children as dependent and grant[ing] FCCS temporary custody of them," not an order extending temporary custody.  *J.H.* at ¶ 65.  It was therefore consonant with the syllabus law of *In re Murray*.

{¶ 62}  In *In re Adams*, 115 Ohio St.3d 86, 2007-Ohio-4840, syllabus, the Supreme Court of Ohio held that "[a] trial court order denying the motion of a children-services agency to modify temporary custody to permanent custody and continuing temporary custody is not a final, appealable order under R.C. 2505.02(B)(1) or (2)."  Although the juvenile court's October 24, 2019 decision did not involve the denial of a motion to modify temporary custody to permanent custody, the *Adams* reasoning when discussing R.C. 2505.02 factors applies with equal force to a temporary custody ruling alone:

> The denial of an agency's motion to modify temporary custody to permanent custody does not "determine[] the action," because the continuation of the agency's temporary custody does not determine the outcome of the action for neglect and dependency. Instead, all parties remain subject to further court order during the temporary-custody phase. A juvenile court has several ultimate dispositional options pursuant to R.C. 2151.415(A), and ordering the continuation of temporary custody do not preclude the juvenile court from exercising any of these options.

*Id.* at ¶ 36.

{¶ 63}  *See also In re Wilkinson*, 2d Dist. No. 15175, 1996 Ohio App. LEXIS 1091, at *4-5 (Mar. 8, 1996) (stating that "the requirement imposed by R.C. 2151.415(D)(1) that the court must issue findings of fact in support of a temporary order extending custody in this fashion does not make an order issued without such findings a final order").

{¶ 64}  The majority seeks to distinguish *Adams* because it involved an appeal by a public agency, not a court.  Thus, "the analysis might differ in the event of an appeal by a parent, who has a substantial right to custody of a child."  (Majority Opinion at ¶ 30, fn. 4.)

But this court has previously held that an extension of temporary custody under R.C. 2151.415(D) did not affect a parent's substantial right in order to meet the requirement of a final appealable order under R.C. 2505.02(B)(2). *See In re M.B.*, 10th Dist. No. 19AP-460, 2020-Ohio-550, ¶ 16-19. There, a trial court denied the agency's motion for permanent custody but extended temporary custody under R.C. 2151.415(D). The mother orally moved to dismiss the case, arguing that the trial court lacked jurisdiction under the two-year limitation on temporary custody extensions under R.C. 2151.415(D)(4). *Id.* at ¶ 9. We dismissed her appeal of the trial court's order overruling the motion for lack of a final appealable order, reasoning as follows:

> Mother has not demonstrated that the trial court's judgments affected her substantial right to the custody of her children. The trial court has yet to enter any final disposition regarding the children. Once the trial court does, Mother may appeal if that disposition is contrary to her interests. In that appeal, she may raise as error the trial court's denial her motions to dismiss and return of custody to her based on the trial court's alleged violation of R.C. 2151.415(D)(4). If Mother prevails in her argument, her right to custody will be vindicated. Consequently, immediate appeals are not necessary to protect Mother's interests.

*Id.* at ¶ 16.

{¶ 65} Thus, I do not believe appellants could have appealed any reasonable efforts finding by the juvenile court other that the initial one accompanying the June 30, 2019 adjudication. However, even if the order extending temporary custody qualified as a final appealable order, why would appellants have appealed from the magistrate's ruling finding that "there has been significant progress on the case plan and there is reasonable cause to believe the children will be reunified with a parent or otherwise permanently placed within the period of extension"? (Oct. 24, 2019 Jgmt. Entry.)

{¶ 66} I acknowledge that an agency's burden under R.C. 2151.419(A)(1) to show that it made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home" did not apply in the juvenile court's hearing on the R.C. 2151.413 motion for permanent custody under the holding of *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43, as applied by the majority. (Majority Opinion at ¶ 28.) The problem is that, as a result, all of the agency's efforts at reunification after the June 30, 2019

adjudication are unchallengeable by appellants. Contrary to the majority's reasoning, the October 24, 2019 decision was not a final appealable order. And even if it were, this leaves the period of time between its entry and the February 7, 2022 final judgment of activity by the agency (or lack thereof) that appellants may not challenge in this appeal, in spite of the juvenile court's characterization of nearly all of its findings as "reasonable efforts."

{¶ 67} I believe that foreclosing appellants' rights to challenge the agency's actions during practically the entirety of this litigation raises a serious due process concern. Zainab Abdul, the Somali-speaking mental health clinician, did not have an initial session with S.Y. until April 2021. (Sept. 1, 2021 Tr. at 184.) This occurred a year and one-half *after* the "reasonable efforts" determination that the majority claims appellants were required to appeal from. Ms. Abdul described her own unsuccessful efforts to obtain a Somali parenting trainer for appellants or a "cultural[ly] specific trainer" to help, as well as her own attempts to educate appellants about autism with videos in Somali. *Id.* at 175-76. FCCS cannot be credited with these efforts.

{¶ 68} We do not know what the outcome of this case would have been if FCCS had engaged in the kinds of efforts Ms. Abdul describes, such as in August 2019 when the GAL "thought with some interventions for the child and for the parents [that] these kids would go home quickly." *Id.* at 70. Without the provision of such resources at an early stage, the writing was on the wall for this family. The younger children were no longer exposed to their parents' native language and began to lose their ability to communicate with them in Somali as soon as they were removed from appellants' home. Thus, it is unsurprising that the caseworker and GAL testified that the children appeared to have less and less of a bond with appellants as time went on.

{¶ 69} The majority also distinguishes this case from *In re T.W.*, 10th Dist. No. 19AP-700, 2020-Ohio-4712, in which we reversed an award of permanent custody under R.C. 2151.414(D)(1) because the juvenile court had failed to consider a number of the required statutory factors. In addition, the opinion stated that although "questions about cultural sensitivity and [appellant's] cultural norms have been pervasive throughout this case, the court's entry failed to make any reference to her country of origin beyond observing that she was 'from West Africa.' " *Id.* at ¶ 14. Here, the juvenile court failed to even mention the basic fact of appellants' origin. The decision lists the names of the

interpreters employed during the trial and lists Ms. Abdul as witness without identifying her role. Otherwise, the decision is completely devoid of any indication that the juvenile court considered the cultural or linguistic issues that, as in *T.W.*, have been "pervasive" in this case.

{¶ 70} Instead, the majority has, in effect, written the findings that the trial court should have provided, including a summary of Ms. Abdul's testimony. (Majority Opinion at ¶ 17-18.) In doing so, "this court created a decision on the juvenile court's behalf rather than reviewing the one that was made." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 48 (Donnelly, J., dissenting). As a consequence, the majority cites evidence the trial court did not rely on to affirm its finding on R.C. 2151.414(D) factors. For example, in its discussion of the "need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency" under R.C. 2151.414(D)(1)(d), the majority cites to the testimony of the caseworker and GAL concerning H.A.'s assertion that she would pray for her children's special needs conditions to go away. The juvenile court never mentioned this aspect of their testimony. The majority's reference to such evidence is prejudicial to appellants, who could not have anticipated the majority's reliance on it. This is but one insuperable barrier of many placed in front of appellants before terminating their parental rights. Because I cannot agree with the majority's decision to affirm the juvenile court's decision, I respectfully dissent.

————————————